SPRINGFIELD METROPOLITAN EXPOSITION AND AUDITORIUM AUTHORITY, Plaintiff-Appellant, *v.* JOHN W. CASTLE, Director, Department of Business and Economic Development, Defendant-Appellee.

Fourth District    No. 16205

Opinion filed November 20, 1980.

Pfeifer & Kelty, P. C., of Springfield (Thomas W. Kelty and Charles R. Hug, of counsel), for appellant.

William J. Scott, Attorney General, of Chicago (Karen Konieczny, Assistant Attorney General, of counsel), for appellee.

Mr. PRESIDING JUSTICE MILLS delivered the opinion of the court:

Who is entitled to the accrued interest on an authority's bond proceeds?

Not the State.

We reverse.

The Springfield Metropolitan Exposition and Auditorium Authority (SMEAA) is a municipal corporation created by the Springfield Metropolitan Exposition and Auditorium Authority Act (Authority Act) (Ill. Rev. Stat. 1979, ch. 85, par. 1251 *et seq.*). The Authority Act requires SMEAA to promote, operate and maintain expositions and conventions within the city of Springfield and the metropolitan area (section 4 of the

Act). In pursuit of these statutory purposes, SMEAA is empowered to purchase or construct convention or exposition centers or civic auditoriums, and SMEAA may exercise the right of eminent domain to acquire sites for such facilities (section 5(a), (c) of the Act). Consistent with these statutory purposes SMEAA, in 1968, began a study of the economic prospects for the construction of a convention center in Springfield, and exercised its eminent domain power in August 1974 to obtain a project site for the Prairie Capital Convention Center in Springfield.

The Authority Act provides several methods whereby SMEAA may raise funds to carry out its purposes, including the issuing of revenue bonds (section 10 of the Act). SMEAA also receives financing from the Metropolitan Civic Center Support Act (Support Act) (Ill. Rev. Stat. 1979, ch. 85, par. 1391 et seq.), which funding is at issue in the instant litigation.

The defendant, John W. Castle, is director of the Department of Business and Economic Development (BED). Castle is being sued in his official capacity in this suit for certain actions taken by BED. (Note: Executive Order No. 3 (1979) abolished BED and transferred its functions to the Department of Commerce and Community Affairs effective October 1, 1979. For the purposes of this opinion, however, the defendant will be referred to as BED.)

BED is an agency organized to foster and encourage the State's economic and industrial growth (Ill. Rev. Stat. 1979, ch. 127, par. 46.1 et seq.), and BED administers the Support Act. By virtue of the Support Act, the director of BED is authorized to certify any authority as eligible for State financial support, provided that authority meets certain conditions. (Ill. Rev. Stat. 1979, ch. 85, par. 1394(2).) When an authority is so certified, it is entitled to receive support payments from the State in a sum which equals the annual principal and interest payments to bondholders (debt service) on a portion of the bonds issued by that authority (section 4(3) of the Act).

The specific portion or dollar amount of the bonds which would be supported in this manner—referred to as the "base sum"—is determined by a formula included in this statute which provides that the base sum shall be the lesser of:

"(a) 75% of the total project costs as determined from applicant's [authority's] estimate.

(b) .0310 times the total assessed valuation for the year 1975 as equalized by the Department of Local Government Affairs, of all taxable property located within the metropolitan area of the Authority.

(c) $20,000,000." (Ill. Rev. Stat. 1979, ch. 85, par. 1394(3) (a) (b) (c).)

The statute further requires that after an authority is certified and a base

sum established, BED and the authority "shall" enter into an agreement whereby the State will agree to pay support payments (section 4(3) of the Act).

In 1974, SMEAA issued 1974 bonds to finance acquisition and construction of the Prairie Capital Convention Center and later agreed with BED to a base sum for State financial support of those bonds. In August 1976, SMEAA applied to BED for recertification and additional State support as at that time the projected cost of the convention center, as estimated by SMEAA, had greatly increased. SMEAA applied for State financial support for a base sum of $16,688,409.28, and subsequently prepared an issue of revenue bonds, Series 1977, in the amount of $20,950,000. The prospectus for the Series 1977 bonds recited that State financial support payments in the amount of $16,189,000 were pledged as security for the bonds. (This figure represents a base sum of $16,668,000 minus $479,000, which represents 1974 bonds that had been retired by State support payments.) SMEAA pledged various additional amounts as security, and the bonds were sold on January 19, 1977.

BED recertified SMEAA for State support and the parties subsequently entered into an agreement, pursuant to section 4 of the Support Act, signed January 8, 1977, for support payments for the Series 1977 bonds. The agreement provided that the State would pay the debt service on the bonds issued in a principal amount equal to the adjusted base sum of $16,189,000. The State included in that agreement paragraph 1(b) (8), which provides:

> "[The Authority] [a]grees that interest earned on an accrual basis upon bond proceeds supported by State Support Payments shall be credited to the Department annually in the form of a setoff from the request to the Department for State Support Payments for that fiscal year, said calculation to be made by the certified public accountants employed by the Authority and accepted and approved by the Department."

BED admitted that it would not have entered into an agreement with SMEAA which did not contain the foregoing paragraph. It is the propriety of the BED's inclusion of this provision which is the capstone issue in this case.

When the Series 1977 bonds were sold in January 1977, the proceeds of the sale were placed in an interest-bearing bank account called the Construction Fund, from which construction cost payments for the convention center were made. By virtue of paragraph 1(b) (8), the State support payments are not equal to the debt service on the bonds as outlined in the amortization schedule, but rather that amount is reduced or offset by the interest earned on the undisbursed bond proceeds lodged in SMEAA's Construction Fund, to the extent that those bond proceeds

represent the base sum supported by the State. SMEAA, pursuant to the agreement, submitted vouchers to BED semi-annually to receive its support payments. SMEAA certified the amount to be set off, in accordance with paragraph 1(b) (8), and forwarded the vouchers to BED *under protest*, as it was the position of SMEAA that BED did not have the statutory authority to include paragraph 1(b) (8) in their agreement.

Based upon its conviction in that regard, SMEAA filed suit for declaratory judgment in the circuit court of Sangamon County in January 1978, seeking to have paragraph 1(b) (8) of the agreement declared *ultra vires*, illegal, without statutory authority and therefore void *ab initio*. After a hearing on cross-motions by the parties for summary judgment based upon stipulated facts, the trial judge entered judgment in favor of BED. SMEAA appeals.

Several issues were raised on appeal, but since we find that the BED acted beyond its statutory authority in including paragraph 1(b) (8) in the agreement, we need not determine the other questions raised.

The nave of the controversy here converges upon the interpretation of a portion of section 4 of the Support Act which provides that after certification of an authority for support:

> "[T]he State shall enter into an agreement with the Authority whereby the State will agree subject to annual appropriation by the General Assembly to pay annually to the Authority from the Fund, (1) an amount equal to the interest and principal cost to the Authority of amortizing revenue bonds issued by the Authority in an amount equal to the base sum * * * ." Ill. Rev. Stat. 1979, ch. 85, par. 1394(3).

■■ Both parties agree that BED was required, under the terms of the above-quoted statute, to enter into the agreement with SMEAA. They are correct. The term "shall" is imperative and mandatory. (*Weill v. Centralia Service & Oil Co.* (1943), 320 Ill. App. 397, 51 N.E.2d 345.) The parties also agree that the statute mandating their agreement is silent on the subject of allocating interest on unused bond proceeds. BED contends that this silence allows BED the freedom to allocate the interest to the State. But the plain meaning of the statute does not support that interpretation. The statute does not expressly give BED the authority to offset the interest earned on bond proceeds from its mandatory payments to SMEAA, and BED—a statutorily created State agency—has only the powers given to it by statute and no broad inherent power beyond such statutory grants. *Champaign County Board of Review v. Property Tax Appeal Board of the Department of Revenue* (1975), 30 Ill. App. 3d 29, 331 N.E.2d 333.

■■■ Further, this is not the type of ministerial function which would flow from BED's statutorily assigned powers. BED, in administering the

Support Act, must take into account all the provisions of the Act and each provision must be given effect. (*Gendel v. Jones* (1978), 58 Ill. App. 3d 739, 374 N.E.2d 815; *Illinois State Employees' Association v. McCarter* (1973), 9 Ill. App. 3d 764, 292 N.E.2d 901.) BED cannot exercise its authority in a way that would render parts of the Support Act meaningless. (*Gendel.*) By including paragraph 1(b) (8) in the agreement and offsetting the interest earned on bond proceeds, the portion of section 4 of the Support Act which requires BED to pay "an amount equal to the interest and principal cost to the Authority of amortizing revenue bonds" is rendered meaningless, as BED is actually paying a *lesser* amount. BED has therefore affirmatively violated the statutory mandate of section 4 of the Support Act by including paragraph 1(b) (8) in the agreement.

The legislative history of the idea of allocating to the State the interest earned on the bonds supports the foregoing interpretation. Prior to 1975, section 4 of the Support Act read substantially as it presently reads and was silent on the allocation of interest on bond proceeds. In January 1975, the Governor signed into law the Metro-East Exposition and Performing Arts Authority Act (Metro-East Act) (Ill. Rev. Stat. 1975, ch. 85, par. 1501 *et seq.*, repealed by Public Act 81-288, effective August 28, 1979), which created a new authority and provided additional financing methods for the other existing authorities including plaintiff. Section 8 of the Metro-East Act established the Auditorium Authority Fund which was to be used by BED for the payment of principal and interest on bonds issued pursuant to that Act. Section 8 expressly granted the State a credit for interest earned on "any interest income derived from the investment of the proceeds of such bonds or payments from the Auditorium Authority Fund * * * ."

Subsequently, in *People ex rel. Peoria Civic Center Authority v. Vonachen* (1975), 62 Ill. 2d 179, 340 N.E.2d 1, the supreme court declared the Metro-East Act unconstitutional under the Illinois Constitution because it provided for additional means of financing various authorities without setting forth completely the statutory sections amended, as is required by section 8(d) of article IV of the Illinois Constitution.

In 1976, section 4 of the Support Act was amended and its language altered to its present form. The change in 1976 modified the amount of State support payments but did not change the substance of the provision relating to the agreement to be executed between BED and an authority. Specifically, the provision relating to agreements did not include any language relating to the crediting of the interest income on bond proceeds similar to that contained in the Metro-East Act. The legislature sought to include a specific reference to the allocation of interest on bond proceeds in the Metro-East Act; the related present and former provisions of the Support Act do not contain that language, and that omission

supports our interpretation of the present language as excluding the power to allocate interest on bond proceeds.

Having reached this conclusion, we need not address SMEAA's other contentions on appeal. BED admitted that it would not have entered into the agreement required by the statute with SMEAA had that agreement not contained paragraph 1(b) (8). Since BED did not have the power to include paragraph 1(b) (8) in its agreement with SMEAA, that provision of the contract is void.

For the foregoing reasons, the judgment of the circuit court of Sangamon County is reversed and the cause remanded.

Reversed and remanded.

CRAVEN and WEBBER, JJ., concur.