**MEDCARE HMO, an Illinois not-for-profit corporation, Plaintiff,**

**v.**

**Phil BRADLEY, individually and in his capacity as Director of the Illinois Department of Public Aid, Defendant.**

**No. 92 C 1270.**

United States District Court,
N.D. Illinois, E.D.

March 18, 1992.

Philip Scott Beck, David Powers Berten, Debra L. Beinstein, Kirkland & Ellis, Chicago, Ill., for plaintiff.

Roland W. Burris, Ill. Atty. Gen. (James C. O'Connell, David Adler, James C. Stevens, Jr., Sp. Asst. Attys. Gen., of counsel, Chicago, Ill.), for defendant.

## MEMORANDUM OPINION

KOCORAS, District Judge:

This matter is before the Court on plaintiff's motion for a permanent injunction. We have jurisdiction pursuant to 28 U.S.C.A. §§ 1331, 1343 (West 1976). For the following reasons, we grant the permanent injunction based on the findings and conclusions set forth below.

## BACKGROUND

Plaintiff, MEDCARE HMO ("MED-CARE"), is an Illinois not-for-profit health maintenance organization ("HMO") serving individuals in and around Chicago. Defendant, Phil Bradley ("Defendant"), is the Director of the Illinois Department of Public Aid ("IDPA"). As Director, Mr. Bradley is responsible for administering the Illinois Medicaid program authorized by Title XIX of the Social Security Act. 42 U.S.C.A. § 1396 *et seq.* (West 1992).

In 1986, MEDCARE and the IDPA entered into a contract. Pursuant to this contract, MEDCARE agreed to provide its services as an HMO to Illinois medicaid recipients. In return, the IDPA agreed to pay MEDCARE a monthly fee that was based on the number of medicaid recipients enrolled by MEDCARE ("enrollees").

The parties periodically renewed and amended the 1986 contract. The last such renewal occurred in September, 1990. Like the 1986 agreement, the 1990 contract required IDPA to pay a monthly fee to MED-CARE based on the number of MEDCARE medicaid enrollees. IDPA promised to pay this fee by the tenth calendar day of each month. The parties agreed that this fee would constitute payment for all of the medical needs incurred by these enrollees during that month. In turn, MEDCARE promised to pay the members of its health care network—those agreeing to do business with MEDCARE, including hospitals, clinics, pharmacies, and physicians—for the services they performed for MEDCARE's medicaid enrollees. MEDCARE promised to provide these payments by the fifteenth of every month or within forty-eight hours after receipt of payment from the IDPA if the IDPA was late in paying MEDCARE.

Under the 1990 provisions, both parties were entitled to terminate the contract with or without cause upon proper notice. An additional thirty days notice was required if either party terminated the contract without cause. Moreover, according to its terms, the 1990 contract would "automatically terminate on September 30, 1992."

Currently, MEDCARE serves the medical needs of approximately 57,000 Illinois citizens. Approximately 43,500 of these citizens are poor people who rely on Medicaid for their health needs. MED-CARE is the second largest Illinois HMO that provides such services. Additionally, MEDCARE operates four wholly-owned clinics, two of which serve the residents of the Robert Taylor Homes and Cabrini Green.

The stimulus, at least in part, for this lawsuit was a meeting attended by both parties on August 27, 1991. According to both Sondra Rafferty and Senator Ted Leverenz, the meeting was requested by them so that a planned recapitalization and reorganization program of MEDCARE could be presented to the IDPA for their information and, hopefully, tentative approval. Under its planned reorganization, MED-CARE would become a for-profit corporation and receive a capital infusion of eight million dollars. The goal of the restructuring was to provide a financial cushion so that MEDCARE could pay its medical care providers on a timely basis even when the IDPA was late in its payments to it. MED-CARE had previously received tentative approval of its plans from the Illinois Department of Insurance, another State agency with some oversight responsibility over MEDCARE.

Although the witnesses who testified at the hearing differed as to many of the specifics about the August 27, 1991 meeting, there was not much dispute that it was a one-sided meeting. Believing that the purpose of the meeting was to inform Director Bradley and other IDPA personnel in attendance about the planned reorganization, Ms. Rafferty began detailing her financial reorganization proposal. Director Bradley, however, abruptly cut her off and asserted that MEDCARE's performance under its contract was deficient in a variety of respects and that these deficiencies would have to be cured prior to any discussion about the reorganization and any possible approval of it. Included as an important aspect of MEDCARE's performance was, per Director Bradley, MEDCARE's tendency to run to Senator Leverenz for

his help in dealing with IDPA's criticisms and complaints.

As previously stated, there was substantial disagreement among the testifying witnesses who attended the August 27, 1991 meeting as to what exactly was said, but all agree that Ms. Rafferty never got a chance to tell the Director and his staff how the reorganization would solve, or help solve, the Department's biggest criticism of MEDCARE's performance under the contract, specifically its late or non-existent payments to its sub-contractor and out-of-plan providers. Although highlighting this and other concerns, Director Bradley refused to discuss specifics at the meeting. There was no exchange of views or airing of differences over MEDCARE's contract performance, and no structure was afforded by IDPA to challenge and disprove, if possible, the criticisms leveled.

One of the disputed issues about the August meeting was whether Director Bradley told the MEDCARE people that the contract would be terminated if MED-CARE sought Senator Leverenz's assistance after the meeting or whether MED-CARE was simply "challenged" not to do so and urged to directly address its claimed performance deficiencies on its own. Director Bradley denied making an overt threat to terminate, although that is how the MEDCARE people viewed his remarks.

In light of the necessary legal outcome of MEDCARE's First Amendment and Fourteenth Amendment claims, it is not necessary for this court to make specific findings as to the content of the meeting, or whether the Director's decision to terminate MEDCARE's contract was based, in whole or in part, on its communications with Senator Leverenz and his efforts on MEDCARE's behalf. Nor do we find it necessary to attempt to define, in this context, proper and politically protected entreaties to an elected legislator as opposed to attempts to use the "clout" of a legislator's office on matters uniquely regulatory in nature. There is no doubt, however, that Senator Leverenz's appearances on behalf of MEDCARE nettled the IDPA people and probably contributed to the decision

to terminate in some small way. At the least, his involvement made the Director's decision to terminate the contract unremorseful.

Soon after the August meeting, Ms. Rafferty spoke with Senator Leverenz. In response, in early September, 1991, Senator Leverenz arranged a meeting with Defendant. Some time later, Defendant wrote a letter, dated January 30, 1992, informing MEDCARE that the IDPA was terminating its 1990 contract without cause. Termination was to become effective on April 1, 1992. In response to this letter, Senator Leverenz scheduled another meeting with Defendant on February 3, 1992. At this meeting, Defendant relied on the "without cause" contractual provision and refused to explain his reasons for the cancellation.

After the senator's unsuccessful meeting, MEDCARE filed this suit. In requesting injunctive relief, MEDCARE alleges that Defendant, as the Director for the IDPA, violated 42 U.S.C.A. § 1983 by infringing on MEDCARE's rights under the First and Fourteenth Amendments. In Count I, MEDCARE contends that the IDPA violated MEDCARE's First Amendment rights because its decision to terminate the contract was primarily motivated by the HMO's lobbying activities and communications with elected state representatives. Additionally, in Count II, MED-CARE contends that the IDPA violated its Fourteenth Amendment due process rights by denying it a meaningful hearing before cancellation. Finally, in its prayer for relief, MEDCARE also seeks to recover attorneys' fees and costs.

## DISCUSSION

### I. *Injunctive Relief*

MEDCARE seeks a permanent injunction. Defendant's primary argument against such relief is that MEDCARE cannot succeed on the merits. Because we disagree and conclude that Defendant has proved all the other elements necessary to grant injunctive relief, we grant the requested relief.

■ As the moving party, MEDCARE has the burden of proving the appropriateness of injunctive relief. We will grant a permanent injunction only if: (1) no adequate remedy at law exists; (2) irreparable harm will arise absent injunctive relief; (3) the irreparable harm suffered in the absence of injunctive relief outweighs the irreparable harm the nonmoving party will suffer if the injunction is granted; (4) the injunction will not harm the public interest; and (5) the moving party will succeed on the merits. *Amoco Production v. Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987); *U.S. v. Rural Elec. Convenience Coop. Co.,* 922 F.2d 429, 432 (7th Cir.1991). We discuss each of these elements in turn.

### A. Success on the Merits

■ We will first address whether MEDCARE can succeed on the merits. This is the only requirement that Defendant specifically contests. MEDCARE has brought suit under 42 U.S.C.A. § 1983. Section 1983 provides plaintiffs with a remedy for the deprivation of rights occurring under color of state law. Section 1983, however, does not provide plaintiffs with any substantive rights. *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1985). Rather, it merely provides remedies for deprivations of rights established elsewhere, such as the Constitution and laws of the United States. *Id.* MEDCARE has alleged that Defendant's actions violate both the First and Fourteenth Amendment. Thus, in order to grant a permanent injunction, MEDCARE must demonstrate that Defendant: (1) acted under color of state law, and (2) either violated the First Amendment or the Fourteenth Amendment's due process clause.

MEDCARE has sufficiently established that Defendant acted under color of state law. MEDCARE's complaint states that "Defendant was at all relevant times acting under color of Illinois" laws, regulations, and policies. Defendant does not contest this statement. Therefore, we need only address whether MEDCARE has proven a First or Fourteenth Amendment violation.

### 1. *Count I—First Amendment Claim*

■ MEDCARE argues that it has presented a viable First Amendment claim. Specifically, MEDCARE contends that Defendant's cancellation of its contract was an act of retaliation against MEDCARE for communicating with various state representatives and engaging in certain lobbying activities. Defendant argues that Count I must fail because MEDCARE is an independent contractor. We agree with Defendant that MEDCARE has failed to prove a First Amendment violation. Therefore, we will not issue a permanent injunction on First Amendment grounds.

■ The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech, or ... the right of the people ... to petition the Government for a redress of grievances." U.S. Const., amend. I. Notwithstanding its language, First Amendment rights are not absolute. *See, e.g., Elrod v. Burns,* 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976).

In *Elrod,* the Supreme Court held that the discharge of a nonpolicymaking public employee, as opposed to a policymaking public employee, solely on the basis of the employee's political beliefs violated the First Amendment. *Elrod,* 427 U.S. at 373, 96 S.Ct. at 2689; *see also Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). The basis of *Elrod* and *Branti* was that these public employees would not express their true political views if their jobs were at risk by doing so. *La Falce v. Houston,* 712 F.2d 292, 293 (7th Cir.1983), *cert. denied,* 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984).

In construing *Elrod* and *Branti,* however, the Seventh Circuit has refused to extend their scope to independent contractors who do business with state governments. The Seventh Circuit first drew this distinction between public employees and independent contractors in *La Falce v. Houston.* In *La Falce,* the court held that the First Amendment did not forbid a city from using political criteria in awarding public contracts to independent contractors. *La Falce,* 712 F.2d at 294–95.

In so holding, the *La Falce* court explained the basis for its distinction. Specifically, the court reasoned that independent contractors generally tend to be less dependent on government jobs than public employees. *Id.* at 294. Additionally, the court further reasoned that firms having extensive government business are often "political hermaphrodites" with extensive connections to both major parties to protect themselves. *Id.* Finally, the court expressed concern that if such a distinction were ignored it would "invite every disappointed bidder for a public contract to bring a federal suit." *Id.* Therefore, the court concluded that independent contractors, unlike certain public employees, retained no First Amendment rights with respect to the awarding of public contracts.

The Seventh Circuit has consistently reaffirmed its ultimate holding in *La Falce.* One such example is *Triad Assoc., Inc. v. Chicago Housing Authority,* 892 F.2d 583 (7th Cir.1989), *cert. denied,* — U.S. —, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990); *see also Downtown Auto Parks, Inc. v. Milwaukee,* 938 F.2d 705 (7th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 640, 116 L.Ed.2d 657 (1991). In *Triad,* the named plaintiffs (collectively "Triad") were numerous corporations owned by two white individuals who claimed that the Chicago Housing Authority ("CHA") had refused to renew their corporations' security services contract solely on the basis of the owners' political beliefs. *Id.* 892 F.2d at 585. The court held that Triad had no First Amendment claim. In so holding, the court found it dispositive that Triad was an independent contractor. *Id.* at 586–88 & n. 5.

Applying the mandate of *La Falce* and *Triad,* we conclude that MEDCARE's First Amendment claim must fail. As in these two cases, MEDCARE is an independent contractor. The terms of MEDCARE's agreement with IDPA provides: "[t]he relationship of the Contractor to the Department arising out of this Agreement shall be that of an Independent Contractor." Agreement, Art. IX(1) at 33. As such, Defendant was entitled to take political considerations into account in dealing with MEDCARE's contract. Accordingly, MEDCARE's First Amendment claim must fail.

We reject MEDCARE's contention that *La Falce* and *Triad* are distinguishable because they involved the "awarding" of public contracts, whereas MEDCARE's contract was "cancelled." Such a distinction is legally irrelevant. *See Horn v. Kean,* 796 F.2d 668, 669 (3rd Cir.1986) (holding that First Amendment did not prevent the "dismissals" of independent contractors); *Inner City Leasing & Trucking v. Gary,* 759 F.Supp. 461, 463–64 (N.D.Ind. 1990) (holding that First Amendment did not prevent the "termination" of public contract). Additionally, we note that no court has sanctioned such a distinction; nor do we find it prudent to do so. Therefore, we refuse to find *La Falce* or *Triad* distinguishable.

We also reject MEDCARE's argument that the Supreme Court's decision in *Rutan v. Republican Party,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), compels us to disregard the independent contractor/public employee distinction. The *Rutan* Court expanded *Elrod* and *Branti.* In *Rutan,* the Court prohibited the hiring, transfer, promotion, or recall of a nonpolicymaking public employee solely on the basis of that employee's political beliefs. *Rutan,* 110 S.Ct. at 2739.

The Seventh Circuit has already addressed the impact of *Rutan* on the independent contractor/public employee distinction. In *Downtown Auto Parks, Inc. v. Milwaukee,* the court held that no First Amendment rights were violated when the city refused to extend its contract with an independent contractor because of the contractor's adverse lobbying efforts. *Downtown Auto Parks,* 938 F.2d at 708–710. In so holding, the court expressly rejected the argument now raised by MEDCARE.

Specifically, the court concluded that the independent contractor/public employee distinction remained viable, even in light of *Rutan.* While the Seventh Circuit acknowledged that "the scope of *Rutan,* and rationale behind it, seem, to be at odds with the holding of *La Falce* and *Triad,*" it refused to expand the reach of *Rutan* to

independent contractors. *Id.* at 709–10 (concluding that while *Rutan* "has altered some of the assumptions upon which the *La Falce* and *Triad* decisions were based, we affirm the continued validity of those earlier cases"). In so holding, the court stressed that *Rutan* was expressly limited to the dismissal of "public employees." *Id.* at 710. Additionally, the court also noted that no appellate court has advocated the abrogation of the independent contractor/public employee distinction. *Id.* Therefore, in light of *Downtown Auto Parks*, we reject MEDCARE's reliance on *Rutan*.

MEDCARE's final argument is that *La Falce* requires us to afford MEDCARE First Amendment protection because the court's underlying justifications propounded for the independent contractor/public employee distinction are not applicable here. Specifically, MEDCARE contends that unlike the independent contractor in *La Falce* it is very dependent on its government job since it obtains seventy-five percent of its business from the IDPA. Additionally, MEDCARE contends that it is "not a 'political hermaphrodite' that plays both sides of the political fence." Finally, recognition of its claim, according to MEDCARE, would "not flood the court system with petty grievances," because unlike the disappointed bidder situation, "this case raises core First Amendment concerns."

We reject this argument as well. No court has advocated a case by case approach to determine whether an independent contractor should be afforded First Amendment rights in light of its similarity to a public employee's position. Rather federal appellate courts have consistently found the status of "independent contractor" to be dispositive. *See Downtown Auto Parks, Inc. v. City of Milwaukee*, 938 F.2d 705, 710 (7th Cir.1991); *Lundblad v. Celeste*, 924 F.2d 627, 628 (6th Cir.) (en banc), *cert. denied*, —— U.S. ——, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991); *Horn*, 796 F.2d at 674; *Sweeney v. Bond*, 669 F.2d 542, 545 (8th Cir.), *cert. denied*, 459 U.S. 878, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982). Not only have these courts advocated such a "bright-line" distinction, but they have also been extremely wary of expanding *Elrod* and *Branti's* scope. *See, e.g., Downtown Auto Parks*, 938 F.2d at 710 (acknowledging that "[a]ll circuits considering the question of whether to extend the holdings of *Elrod* and *Branti* to independent contractors have declined"); *Horn*, 796 F.2d at 678 (concluding that "[w]e do not know where *Elrod* and *Branti* will carry us, but we do know that once a genie escapes from the bottle he is not easily cabined. We believe that it is a danger for courts, other than the Supreme Court, to expand this particular rule"). Therefore, notwithstanding any perceived merit in adopting the case by case approach advocated by MEDCARE, it would be inappropriate to do so in light of this formidable authority. As such, we reject MEDCARE's reliance on *La Falce* and refuse to issue an injunction based on First Amendment grounds.

### 2. *Count II—Due Process Claim*

Although MEDCARE has no viable First Amendment claim, MEDCARE may be entitled to an injunction if it can prove a due process violation. After considering the parties' arguments, we conclude that MEDCARE has made such a showing.

Count II of MEDCARE's complaint alleges a procedural due process claim. *See Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990) (explaining the three types of § 1983 claims that may be brought under the due process clause). The Fourteenth Amendment provides, in pertinent part, that no State shall "deprive any person life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. Thus, in order to succeed on its second count, MEDCARE must demonstrate both a protectable property interest and that Defendant, while acting under color of state law, deprived it of that interest "without due process of law." *Zinermon*, 110 S.Ct. at 983.

The first issue we must address then is whether MEDCARE has a protectable property interest. A property interest cannot be a mere unilateral expectation; rather, it must be a legitimate claim of

entitlement. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Such legitimate claims of entitlement are normally "not created by the Constitution." *Id.* Rather, they "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id.*

Citing both Illinois Supreme Court authority and federal case law, MEDCARE states that it has an interest in its contract with the state which is deserving of both legal recognition and protection. In *Bio-Medical Laboratories, Inc. v. Trainor*, 68 Ill.2d 540, 12 Ill.Dec. 600, 370 N.E.2d 223 (1977), the State of Illinois intended to terminate a Medicaid provider from the medical assistance program on the basis of fraud. In language relevant to the nature of the provider's interest involved, the Illinois Supreme Court held that the expectation of continuing to receive Medicaid payments on behalf of the Medicaid recipients serviced was a protectable legal interest. Arbitrary governmental action, either substantively or procedurally, against such a provider was condemned, as was the inability to challenge the processes and the evidence confronting the provider.

MEDCARE also contends that it retains a legitimate claim of entitlement under Illinois' Public Aid Code. Ill.Ann.Stat. ch. 23, para. 1–1, *et seq.* (Smith–Hurd 1988). In particular, MEDCARE contends that paragraph 12–4.25 creates such a property interest. Paragraph 12–4.25 is entitled "Denial, suspension or termination of eligibility to participate as vendor of goods or services to recipients under medical assistance program." Ill.Ann.Stat. ch. 23, para. 12–4.25. The legislature enacted this statute after the Illinois Supreme Court decision in *Bio–Medical Laboratories. See id.* (holding that the IDPA lacked the requisite statutory authority to terminate the State's relationship with a medicaid vendor).

In response to this decision, the Illinois legislature enacted paragraph 12–4.25(A). This statute provides the director of the IDPA with the authority to terminate vendors' contracts when cause exists. Ill.Ann.

Stat. ch. 23, para. 12–4.25(A)(a)–(g). Additionally, paragraph 12–4.25(A) requires that any denial, suspension or termination of an individual's eligibility to participate as a "vendor of goods or services to recipients under the medical assistance program under Article V" be preceded by "reasonable notice and [an] opportunity for a hearing." *Id.*

This statute and Illinois case law provide MEDCARE with a protectable property interest. The statutory limitations on the IDPA's authority to "deny, suspend, or terminate" a vendor's eligibility to participate in the Medicaid program create a legitimate claim of entitlement to those parties covered under the statute. *Cf. Easter House v. Felder*, 910 F.2d 1387, 1395 (7th Cir.1990) (en banc), *cert. denied*, ⸺ U.S. ⸺, 111 S.Ct. 783, 112 L.Ed.2d 846 (1991) (holding that the "statutory and regulatory limitations upon the DCFS's authority to deny license renewals to child welfare agencies created" a protectable property interest); *Goss v. Lopez*, 419 U.S. 565, 573, 95 S.Ct. 729, 735, 42 L.Ed.2d 725 (1975) (finding that "a state employee who under state law ... has a legitimate claim of entitlement to continued employment absent sufficient cause for discharge may demand" due process protection).

Equally clear is that the statute applies to MEDCARE. It is undisputed that Defendant is attempting to "terminate" MEDCARE's "eligibility to participate ... under the medical assistance program under Article V." Additionally, MEDCARE is a "vendor" as defined by Illinois law. The Illinois Administrative Code defines "vendor" for purposes of the Illinois Public Aid Code. It provides that a vendor "shall mean a person, firm, corporation, association, agency, institution, or other legal entity receiving payment or applying for authorization to receive payment for goods or services to a recipient or recipients." 89 Ill.Admin.Code Ch. I, § 140.13(d).

MEDCARE falls within this definition because it is a corporation that receives payment for services provided to public aid recipients. MEDCARE is contractually entitled to monthly payments from the IDPA.

This money is provided to MEDCARE, at least in part, for the services it provides to public aid recipients. (Trans. 3/10/92, p. 280). MEDCARE itself owns numerous clinics for public aid recipients. (Trans. 3/09/92, p. 10). Additionally, the HMO provides a service by coordinating other parties, such as hospitals, clinics, pharmacies, and physicians, to care for these indigent people. Furthermore, numerous contractual provisions indicate that the IDPA considered MEDCARE to be a vendor within the meaning of the Illinois Administrative Code.[1] Indeed, the heading for the contract is entitled "Agreement For Furnishing Health Services." Finally, we note that under the Court's questioning Director Bradley, himself, testified that he viewed MEDCARE to be a "vendor."[2] (Trans. 3/09/92, p. 217–18). Therefore, it is indisputable that MEDCARE is a "vendor" within the meaning of the Illinois Public Aid Code and that it retains a protectable property right under Illinois law.

We reject both of Defendant's textual arguments for why MEDCARE is not a vendor. First, Defendant contends that since MEDCARE is an independent contractor under its contract it cannot also be a vendor. There is no evidence to believe that the two types of relationships are mutually exclusive, and it defies logic and common sense to believe that they are. Additionally, Defendant contends MEDCARE is merely an insurance company, not a vendor, under its contract and that it receives IDPA payments irrespective of any health services provided to its medicaid enrollees. This contention is absurd. The argument ignores the very broad definition of "vendor" in the Illinois Administrative Code, ignores the plain contract language, and we therefore reject it.

Defendant further argues that MEDCARE has no protectable property right because of the at-will provision in MEDCARE's contract. Specifically, Defendant contends that MEDCARE could have no reasonable expectation of continuing to participate in the State's program because the contract was terminable at any time for any reason with sixty days notice.

We reject this argument as well. As the Illinois Supreme Court has recognized, "an administrative agency is a creature of statute," and therefore "any power or authority claimed by it must find its source within the provisions of the statute by which it is created." *Bio–Medical Laboratories*, 12 Ill.Dec. at 605, 370 N.E.2d at 228. Otherwise, the administrative agency's action is void. *See, e.g., Springfield Metro. Exposition and Auditorium Auth. v. Castle*, 90 Ill.App.3d 710, 46 Ill.Dec. 3, 6–7, 413 N.E.2d 443, 446–47 (4th Dist.1980), *aff'd*, 86 Ill.2d 327, 56 Ill.Dec. 64, 427 N.E.2d 144 (1981) (holding contractual term "void" because state agency was not statutorily authorized to bargain for such a provision). Nowhere in paragraph 12–4.25(A) is the IDPA authorized to terminate a vendor's contract for no reason or any reason whatsoever. Moreover, Defendant has failed to produce any other statutory or administrative rule that authorizes such a termination. Furthermore, if we were to adopt Defendant's argument, paragraph 12–4.25(A)'s procedural protections and mandate would be totally eviscerated by the mere inclusion of an at-will contractual provision by the IDPA. We refuse to sanction such a position. *Cf. Castle*, 46 Ill.Dec. at 7, 413 N.E.2d at 447 (refusing to allow administrative agency to "exercise its authority in a way that would render parts of the Support Act meaningless"). Therefore, we reject Defendant's waiver argument and conclude that MEDCARE retained a pro-

---

1. For instance, the contract's first "whereas clause" states that MEDCARE agrees to comply with all necessary laws in order "to enable it to provide health services under this Agreement." Additionally, the fourth "whereas clause" provides that MEDCARE agrees that it is "able to provide the medical care and services required under this Agreement." There are just two examples. Numerous others abound.

2. Moreover, counsel for MEDCARE highlighted numerous instances where Director Bradley referred to MEDCARE as a vendor in his deposition. Additionally, while certainly not dispositive, we note that Defendant's answer initially admitted that MEDCARE was a vendor and only later amended his answer to delete this averment.

tectable property interest under the Fourteenth Amendment.[3]

Concluding that a protectable property interest exists, however, does not end our inquiry. We must now address the second aspect of the Fourteenth Amendment claim: whether MEDCARE was denied "due process of law." The issue we must address is what process MEDCARE was due. Not surprisingly, MEDCARE contends that the due process clause requires a predeprivation hearing while Defendant argues that the clause only mandates a postdeprivation hearing.

Due process is "a flexible concept that varies with the particular situation." *Zinermon*, 110 S.Ct. at 984. At the very least, however, due process requires adequate notice and a meaningful opportunity to explain. *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). The precise form of notice and kind of hearing required depends upon a balancing of the competing public and private interests involved as defined in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).[4] The *Mathews* factors include: (1) the private interest affected by the governmental action; (2) the risk of erroneous deprivation and the value of additional safeguards; and (3) the governmental interest, including the fiscal and financial burdens that additional or substitute procedural requirements would entail. *Id.* at 335, 96 S.Ct. at 903. Although there are exceptions, *see, e.g., id.* at 347–49, 96 S.Ct. at 908–10, the application of these factors "usually" requires "some kind of a hearing *before* the State deprives" a person of its property interest. *Zinermon*, 110 S.Ct. at 984 (emphasis in original).

Applying the *Mathews* factors, we hold that the due process clause requires prede-

privation notice of the charges against MEDCARE and a predeprivation hearing in which MEDCARE can challenge the validity of those charges. First, we note the significant private interests at stake. Seventy-five percent of MEDCARE's business comes from the IDPA. MEDCARE contends, and we are inclined to agree, that cancellation of its contract with the State will cause MEDCARE to go out of business. Additionally, there will be a serious potential disruption among the lives of those MEDCARE enrollees who receive public aid. For instance, those MEDCARE enrollees using the Robert Taylor and Cabrini Green clinics operated by MEDCARE would have to obtain medical services elsewhere. It is reasonable to believe that many will not or could not incur the expense and trouble of traveling to new clinics for needed health care. Additionally, due to communication problems, it is likely that many MEDCARE enrollees will be confused about the termination of MEDCARE's contract and their health care options for some time.

On the other hand, we see little harm to the State in requiring predeprivation notice and a hearing. There is no emergency situation here as evidenced by the fact that the State was willing to provide MEDCARE sixty days instead of thirty days before cancellation. Additionally, Defendant chose to cancel the contract "without cause." Thus, to the extent that MEDCARE's performance has been deficient, these deficiencies do not appear to be so severe as to warrant avoiding predeprivation procedural safeguards. Furthermore, the fact that paragraph 12–4.25(A) requires a predeprivation hearing and notice is proof that the Illinois legislature does not believe such procedures to be unduly burdensome. Finally, we note that Defendant provided virtually no predeprivation procedural safeguards, and consequently there was some

---

3. Because we conclude that Defendant lacked the authority in the first instance to request MEDCARE to waive its constitutional rights, those cases cited by Defendant that hold that a party may waive such rights are irrelevant.

4. It is clear that the procedural process due an individual is strictly a federal question governed by federal constitutional law. Thus, paragraph

12–4.25(A) and its procedural safeguards have no direct bearing on the process owed MEDCARE under the due process clause. *See Jones v. Doria*, 767 F.Supp. 1432, 1438 (N.D.Ill.1991). It is certainly in harmony with the interests at play here and with notions of fundamental fairness, however, even though not controlling.

meaningful risk of an erroneous deprivation. Therefore, we conclude that *Mathews* requires a predeprivation hearing and notice.

Even though the evidentiary hearing in this case was relatively short, limited in scope, and not intended to definitively resolve whether MEDCARE was performing properly under the contract, a good portion of the evidence revolved around whether, and to what extent, MEDCARE was late, or non-existent, in its payments to providers of services to MEDCARE enrollees. As will be remembered from earlier in this opinion, IDPA's main complaint with MEDCARE was its slow pay, or no pay, policy with respect to payments to other providers. Necessary to a fair evaluation of this dispute between MEDCARE and those claiming late or non-existent payments was knowledge of the position of the parties to the dispute and an informed opinion as to whether MEDCARE's position in these disputes was justified. Director Bradley lacked this knowledge and did not profess to have an opinion as to the bona fides of MEDCARE's position.

As an HMO medicaid provider, MEDCARE has an obligation to provide medical services to its enrollees. It does this principally by entering into contracts with various physicians, hospitals and other medical personnel and entities which render medical services to the MEDCARE enrollees in return for agreed payment amounts. These contracting parties are known as in-plan providers. As happens from time to time, MEDCARE enrollees require emergency hospital and physician services from providers who do not have pre-existing contracts with MEDCARE. These persons and organizations are known as out-of-plan providers. Even though these enrollees are medicaid patients, IDPA's position, reasonably appearing, is not to honor requests for payment by the out-of-care providers but to direct them to seek payment from MEDCARE, the HMO contractually bound to provide services to the enrollees. When doing so, these out-of-plan providers bill MEDCARE at the private patient rate, that is, at the highest billing rate possible. MEDCARE's position, simply stated, is

that the out-of-care providers are entitled only to payment based on Medicaid rates in light of the fact that these are medicaid patients. Because medicaid rates are considerably lower than private patient rates, the differences over time involve a great deal of money.

The rate dispute described above has spawned a great many complaints and much collection action from these out-of-plan providers providing emergency medical services to MEDCARE enrollees. Many of these disputes have resulted in commercial litigation involving MEDCARE. The evidence at the hearing showed that this rate dispute was the source of most of the indebtedness that MEDCARE has allegedly defaulted on. Although the evidence clearly established that MEDCARE many times was a slow payer on non-disputed items, a posture sometimes exacerbated by the Department's own delay in payments to MEDCARE, MEDCARE's position in the disputed matters cannot be said to be unreasonable in the absence of greater analysis.

Surprisingly, director Bradley was generally ignorant of the nature of the above-described disputes between MEDCARE and these other medical providers and had no position as to whether MEDCARE was right or wrong. This neutrality of interest in the disputes and litigation was also the official position of Robert W. Wright, Deputy Director of IDPA. In light of that, the meaningful risk of erroneous deprivation in the absence of a predeprivation hearing is manifest. At the least, fundamental fairness requires a statement of charges and an opportunity to be heard before the unilateral termination of a multi-million dollar contract affecting the lives of thousands should be permitted to stand. The one opportunity Ms. Rafferty had to explain to the Director how MEDCARE planned to resolve the matter of late payments of non-disputed billings was aborted by the Director's abrupt action. Fair play would seem to require more.

Those cases relied on by Defendant in support of a postdeprivation hearing are distinguishable. In both *Americana*

*Healthcare Corp. v. Schweiker,* 688 F.2d 1072 (7th Cir.1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 434 (1983), and *Northlake Community Hospital v. United States,* 654 F.2d 1234 (7th Cir.1981), the relative interests at stake were different. In both cases, there were meaningful predeprivation procedural safeguards to protect against erroneous deprivations. Additionally, both cases dealt with hands-on medical providers who directly served medicaid recipients. Thus, the governmental interests at stake were much higher in these cases. Therefore, Defendant's reliance on them is misplaced.

 We also reject Defendant's contention that the *Parratt/Hudson* doctrine requires dismissal of this action. Under this doctrine, a state cannot be held liable under section 1983 for a denial of predeprivation procedural due process at the hands of a state actor if the deprivation is random, unauthorized, and there is an adequate postdeprivation remedy under state law. *Parratt v. Taylor,* 451 U.S. 527, 543–44, 101 S.Ct. 1908, 1916–17, 68 L.Ed.2d 420 (1981); *Hudson v. Palmer,* 468 U.S. 517, 530–33, 104 S.Ct. 3194, 3202–04, 82 L.Ed.2d 393 (1984). The Supreme Court has recognized that the *Parratt/Hudson* doctrine represents "a special case of the general *Mathews v. Eldridge* analysis, in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide." *Zinermon,* 110 S.Ct. at 985. In *Parratt,* state prison officials negligently lost a prisoner's mail-order hobby materials. *Parratt,* 451 U.S. at 529, 101 S.Ct. at 1910. In *Hudson,* another state prison official intentionally destroyed a prisoner's personal property. *Hudson,* 468 U.S. at 519–20, 104 S.Ct. at 3196–97. The underlying rationale for both cases was that the deprivation at issue was the "result of a random and unauthorized act by a state employee. In such a case, the loss is

not a result of some established state procedure and the State cannot predict precisely when the loss will occur." *Parratt,* 451 U.S. at 541, 101 S.Ct. at 1916. Therefore, the plaintiffs only remedy was a state tort action which was readily available.

The Supreme Court recently revisited the *Parratt/Hudson* doctrine in *Zinermon v. Burch.* However, whatever *Zinermon's* impact on the doctrine,[5] it is clear that MEDCARE has pleaded a viable due process claim. Both *Zinermon* and the *Parratt/Hudson* doctrine require, *inter alia,* that the state employee's action be "unauthorized" in order to dismiss the federal action. *Zinermon,* 110 S.Ct. at 990; *Parratt,* 451 U.S. at 543, 101 S.Ct. at 1916. A state official's conduct is "authorized" if the State provides that official not only with the statutory power and authority to effect the deprivation complained of but also the concomitant duty to initiate the procedural safeguards established by state law to guard against the risk of that deprivation. *Zinermon,* 110 S.Ct. at 990; *see also Easter House,* 910 F.2d at 1402. Because paragraph 12–4.25(A) of Illinois' Public Aid Code vests in Defendant just such an authority, neither the *Parratt/Hudson* doctrine nor *Zinermon* apply. *See* Ill.Ann. Stat. ch. 23, para. 12–4.25(A). Moreover, the underlying rationale of the *Parratt /Hudson* doctrine is that predeprivation procedural safeguards are not "feasible." *Zinermon,* 110 S.Ct. at 987; *Parratt,* 451 U.S. at 541, 101 S.Ct. at 1916. Here, Defendant had ample opportunity to hold a predeprivation hearing prior to cancelling MEDCARE's contract. Therefore, we conclude that neither the *Parratt/Hudson* doctrine nor *Zinermon* require the dismissal of MEDCARE's due process claim.

## B. No Adequate Remedy at Law

In addition to proving a due process violation, MEDCARE must also demonstrate that it has no adequate legal remedy.

---

5. Although not entirely clear, there appears to be a consensus that *Zinermon* requires a "narrow" application of the *Parratt/Hudson* doctrine. *See Easter House,* 910 F.2d at 1400 & 1411 (en banc majority & dissenting opinion) (concluding that *Zinermon* requires a "narrow" interpretation of the doctrine); *Caine v. Hardy,* 905 F.2d 858, 862 (5th Cir.1990) (same). *But see Easter House,* 910 F.2d at 1408 (Easterbrook, J., concurring) (concluding that *Parratt* and *Hudson* as decided "cannot coexist" with *Zinermon* ).

MEDCARE has done so. Defendant's cancellation threatens MEDCARE's existing relationship with its numerous health care providers. Indeed, since Defendant's notice of termination, one hospital has already cancelled its contract with MEDCARE. Additionally, MEDCARE stands to lose seventy-five percent of its enrollees and business. As such, there is a serious risk that MEDCARE will go out of business. Furthermore, the scheduled eight million dollar capital infusion into MEDCARE and its reorganization will not take place if the IDPA cancels its contract. Because it is impossible to calculate damages from these injuries, MEDCARE lacks an adequate legal remedy. *Cf. Hyatt Corp. v. Hyatt Legal Services*, 736 F.2d 1153, 1158 (7th Cir.), *cert. denied*, 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 361 (1984) (finding that there is " 'no effective way to measure the loss of sales or potential growth—to ascertain the people who don't knock on the door or to identify the specific persons who do not [return] because of the existence of the infringer' ").

### C. Irreparable Harm

MEDCARE has also demonstrated that it will suffer irreparable harm without an injunction. Defendant does not argue to the contrary. Defendant's actions will likely force MEDCARE out of business because it will lose seventy-five percent of its revenue, and it will be unable to finalize its reorganization plans which apparently are critical to the HMO's survival. Moreover, even if MEDCARE were to survive, its network of enrollees and providers would be devastated. Without an injunction, Defendant will inform all MEDCARE enrollees and providers that they should enroll with another HMO. These consequences amount to irreparable injury.

### D. Balance of Hardships

The balance of hardships also favors MEDCARE because the IDPA will incur little, if any, harm if we grant an injunction. Again, Defendant has failed to address this issue. Although the IDPA has articulated some problems with MEDCARE's performance under its contract, these problems were not serious enough to warrant a cancellation for cause. Instead, the IDPA chose to cancel the contract without cause, giving MEDCARE an additional thirty days to operate. In contrast, as mentioned above, without an injunction, MEDCARE stands to incur substantial hardship. Under such circumstances, the balance of hardships weighs heavily in favor of MEDCARE. *See Planned Parenthood v. Wichita*, 729 F.Supp. 1282, 1291–92 (D.Kan.1990).

### E. Public Interest

Although a closer question, we conclude that injunctive relief would not be adverse to the public's interest. MEDCARE contends that three distinct public injuries will arise if we fail to issue an injunction. First, MEDCARE claims that medicaid recipients' freedom of choice will be impaired since MEDCARE is only one of two major HMO's that serve medicaid recipients. Second, MEDCARE contends that its dissolution will deprive "some of Chicago's poorest people of the *only* care that is available." In support of this contention, MEDCARE maintains that its clinics near the Robert Taylor Homes and Cabrini Green, which serve thousands of underserved citizens, will close, leaving these individuals without any meaningful health care alternatives. Finally, MEDCARE argues that Defendant's cancellation will cause the logistical problem of requiring thousands of poor people to find new health care services in a relatively short period of time.

Defendant, on the other hand, contends that MEDCARE's continuing operation adversely affects the public. Initially, Defendant rebuts MEDCARE's first argument regarding freedom of choice by insisting that medicaid recipients would be free to receive health care under the State's fee for service program. Additionally, Defendant maintains that MEDCARE is currently being sued by numerous hospitals that contend MEDCARE owes them hundreds of thousands and, in some cases, millions of dollars in outstanding bills. MEDCARE has responded to these charges by acknowledging such lawsuits but by insisting

that it has paid these hospitals all that they are entitled to under federal and state law.

On the whole, we conclude that an injunction will not adversely affect the public's interest. We agree that many medicaid recipients will be underserved if MEDCARE were to go out of business abruptly. Specifically, we believe that approximately 4,500 medicaid recipients who obtain medical services from the Robert Taylor Home's clinic run by MEDCARE would be severely harmed. Additionally, many remaining medicaid MEDCARE enrollees would be confused for some time regarding their health care options without an injunction. Furthermore, the IDPA canceled MEDCARE's contract without cause; this entitled MEDCARE to continue operating for an additional thirty days. As such, we can only conclude that the IDPA did not believe MEDCARE was a serious medical or financial threat to its enrollees or providers. Finally, we note that the IDPA has no official position on the lawsuits currently pending between MEDCARE and the various hospitals and that MEDCARE continues to pay these hospitals that amount it believes the hospitals are legally entitled to. Therefore, we conclude that issuing the injunction will not adversely affect the public's interest.

II. *Attorneys' Fees and Costs*

In addition to seeking injunctive relief, MEDCARE also seeks attorneys' fees and costs. MEDCARE, however, has failed to present any reason justifying such relief. Accordingly, we deny the request.

## CONCLUSION

For the foregoing reasons, we grant plaintiff's request for a permanent injunction. As such, Defendant is prohibited from:

(i) cancelling MEDCARE's contract with the IDPA without cause;

(ii) communicating to MEDCARE's enrollees or providers that MEDCARE's contract has been or will be cancelled;

(iii) communicating to MEDCARE's enrollees or providers for the purpose of requiring or encouraging them to change their affiliation with MEDCARE;

(iv) failing to pay MEDCARE all monies owed it under the IDPA/MEDCARE contract.

Additionally, we deny MEDCARE's request for attorneys' fees and costs.