**Keen A. UMBEHR, Plaintiff–Appellant,**

v.

**Joe McCLURE, Glen Heiser, and George Spencer, Defendants–Appellees.**

No. 94–3022.

United States Court of Appeals, Tenth Circuit.

Jan. 4, 1995.

Rehearing Denied Feb. 10, 1995.

STEPHEN H. ANDERSON, Circuit Judge.

Plaintiff and appellant Keen A. Umbehr appeals the district court's grant of summary judgment to Defendants, members or ex-members of the Wabaunsee County Commission, on his 42 U.S.C. § 1983 action alleging that Defendants terminated a trash hauling contract in retaliation for Mr. Umbehr's exercise of his right to free speech. For the following reasons, we REVERSE and RE-MAND.

## BACKGROUND

Mr. Umbehr operated a trash hauling business in Wabaunsee County, Kansas. By statute, the county was obligated to provide a plan for solid waste disposal. In 1981, the county entered into a contract with Mr. Umbehr. The contract was renegotiated in 1985. The 1985 contract is the one at issue in this case.

Under the contract, Mr. Umbehr did not in fact haul trash for the county. Rather, the contract provided that Mr. Umbehr could haul trash for cities in the county, at a rate specified in the contract, provided each city endorsed and ratified the contract. No city was under any obligation to ratify the contract. Each city had the right to opt out of the contract on ninety days' notice. The contract itself was automatically renewed for successive one-year terms, unless either party gave sixty days' notice of termination or ninety days' notice of intent to renegotiate. The contract further provided that, during its term, the county and each city which approved the contract agreed not to contract with "any other individual or firm to provide solid waste removal from residential premises in any [c]ity." Appellees' App. at 139.

Mr. Umbehr hauled trash for six of the seven cities in the county from 1985 until the county terminated the contract in 1991. In other words, the contract was automatically renewed each year, according to its terms. Throughout this time period, Mr. Umbehr spoke out at county commission meetings

Robert A. Van Kirk, Alexandria, VA (Richard H. Seaton and Brenda J. Bell, Everett Seaton Miller & Bell, Manhattan, KS, with him on briefs), for appellant.

Donald Patterson, Fisher Patterson Sayler & Smith, Topeka, KS, for appellees.

Before ANDERSON and TACHA, Circuit Judges, and CAMPOS,* District Judge.

* The Honorable Santiago E. Campos, Senior District Judge, United States District Court for the District of New Mexico, sitting by designation.

and wrote letters and columns in local newspapers about a variety of topics, including landfill user rates, the cost of obtaining county documents from the county, alleged violations by the county commission of the Kansas Open Meetings Act, and a number of alleged improprieties, including mismanagement of taxpayer money, by the county road and bridge department.

Defendants Joe McClure, Glen Heiser, and George Spencer were all members of the Wabaunsee County Commission in 1990, when the commission voted to terminate the contract with Mr. Umbehr. Mr. Spencer and Mr. Heiser voted for termination, whereas Mr. McClure voted against termination. In fact, the attempted termination was not valid, and the contract continued for another year, until it was validly terminated in January 1991. At the time the contract was terminated, Mr. McClure was no longer on the county commission. His replacement on the commission voted not to terminate the contract, whereas Mr. Spencer and Mr. Heiser again voted in favor of termination. Mr. Umbehr subsequently entered into separate contracts to haul trash with five of the six cities he had previously served. The county did not enter into any other contracts involving trash hauling.

Mr. Umbehr brought suit against Defendants, claiming that they caused the termination of his contract with the county in retaliation for his outspoken criticism of the county and the county commission, thereby violating his First Amendment right of free speech. He sued Defendants Heiser and Spencer in both their official and individual capacities. He sued Defendant McClure only in his individual capacity. Defendants filed motions for summary judgment. The district court assumed, solely for the purpose of its decision, that Mr. Umbehr "would have been protected from termination in retaliation for his statements" had he been a government employee, that his "comments did motivate the votes in favor of terminating [Mr. Umbehr's] contract with Wabaunsee County," and that he suffered damages as a result of the termination. *Umbehr v. McClure,* 840 F.Supp. 837, 839 (D.Kan.1993). It then granted Defendants' motion for summary judgment on the ground that "the First Amendment does not prohibit defendants from considering plaintiff's expression as a factor in deciding not to continue with the trash hauling contract at the end of the contract's annual term." *Id.* The court expressly declined to rule on Defendants' claim that their actions were protected by legislative immunity, but held, alternatively, that Defendants were entitled to qualified immunity from damages for their actions. Finally, the district court held that Mr. McClure was additionally entitled to summary judgment because there was "insufficient evidence which proves that defendant McClure caused the termination of the contract." *Id.* at 841.

## DISCUSSION

Summary judgment is appropriately granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "We review a district court's summary judgment determination de novo, viewing the record in the light most favorable to the nonmoving party." *Artes–Roy v. City of Aspen,* 31 F.3d 958, 961 (10th Cir.1994).

Although neither party has raised this issue, we first determine whether Mr. Umbehr has standing to bring this case. Standing is a threshold issue, "jurisdictional in nature." *Doyle v. Oklahoma Bar Ass'n,* 998 F.2d 1559, 1566 (10th Cir.1993). "For standing to exist, the plaintiff must 'allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Id.* (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)). The alleged injury "must be 'distinct and palpable,' *Warth v. Seldin,* 422 U.S. 490, 501 [95 S.Ct. 2197, 2206, 45 L.Ed.2d 343] (1975), as opposed to abstract, conjectural, or merely hypothetical." *Id.* (parallel citations omitted).

We conclude that Mr. Umbehr has standing. Mr. Umbehr asserts a violation of his First Amendment rights—punishment, in the form of termination of a contract beneficial to him, because of his speech. While Defendants assert that the contract provided

no benefit to the county, from which one could infer that its termination could inflict no injury on the county, Mr. Umbehr has alleged a benefit to him from the contract.[1] The contract obviated the need for him to individually negotiate a trash hauling contract with each city; it gave him the exclusive right to haul trash for cities that ratified the agreement; and it gave him, for at least sixty days, the right to haul trash for cities pursuant to the agreement, inasmuch as the county could only terminate the contract on sixty days' notice.[2] *Cf. Federal Deposit Ins. Corp. v. Henderson,* 940 F.2d 465, 476 (9th Cir.1991) (holding that private contract providing for immediate termination for cause or at will termination on ninety days' notice "gave rise to a 'legitimate claim of entitlement' to ninety days of continued employment"). Further, he claims monetary injury from the termination of the contract, and there is no dispute that any such injury is " 'fairly traceable' " to Defendants' actions in terminating the contract. *Doyle,* 998 F.2d at 1566 (quoting *Allen,* 468 U.S. at 751, 104 S.Ct. at 3324). He has clearly alleged an injury caused by Defendants. Accordingly, Mr. Umbehr has standing. We turn now to the merits of his claim that his First Amendment rights have been violated.

Mr. Umbehr was indisputably an independent contractor. As the district court acknowledged, there is conflicting case law on whether those who independently contract with the government share the same degree of First Amendment protection for their speech as government employees.[3] A number of courts have held that governments may award or terminate public contracts on the basis of political affiliation or support. *See Triad Assocs., Inc. v. Chicago Hous. Auth.,* 892 F.2d 583 (7th Cir.1989) (holding that independent contractor claiming loss of and denial of contracts because of political affiliation was not protected by First Amendment), *cert. denied,* 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990); *LaFalce v. Houston,* 712 F.2d 292 (7th Cir.1983) (holding that independent contractor claiming denial of public contract because of political affiliation was not protected by First Amendment), *cert. denied,* 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984); *Horn v. Kean,* 796 F.2d 668 (3d Cir.1986) (en banc) (holding that independent contractors whose contracts were terminated following a change in administration were not protected by the First Amendment); *Sweeney v. Bond,* 669 F.2d 542, 545 (8th Cir.) (holding that fee agents who were not employees but were " 'more in the nature of independent contractors' " who were dismissed following a change in administration were not protected by the First

---

1. Mr. Umbehr does not claim, nor need he, that he has a property interest in his contract. "[T]he Supreme Court has held a property right is not required for a first amendment retaliation claim." *Abercrombie v. City of Catoosa,* 896 F.2d 1228, 1233 (10th Cir.1990) (citing *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)). In *Perry,* the Court made the following widely quoted statement:

 For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.

 *Perry,* 408 U.S. at 597, 92 S.Ct. at 2697.

2. Cities bound by the contract could only opt out on ninety days' notice.

3. A public employee speaking on a matter of "public concern" is protected from an adverse employment decision if "the interests of the [employee], as a citizen, in commenting upon matters of public concern [outweigh] the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees," *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968), and if the employee proves that the protected speech was a "motivating factor" in the adverse employment decision. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *see also Bisbee v. Bey,* 39 F.3d 1096, 1100 (10th Cir.1994). Speech on matters of public concern has been defined generally as speech "relating to any matter of political, social, or other concern to the community." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). For example, speech disclosing governmental wrongdoing or misconduct is generally of public concern. *See, e.g., Walter v. Morton,* 33 F.3d 1240, 1243 (10th Cir. 1994); *Wulf v. City of Wichita,* 883 F.2d 842, 857 (10th Cir.1989).

Amendment), *cert. denied,* 459 U.S. 878, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982); *Ambrose v. Knotts,* 865 F.Supp. 342, 345 (S.D.W.Va. Oct. 17, 1994) (holding that independent contractor claiming termination of contract in retaliation for petition was not protected by First Amendment); *O'Hare Truck Serv., Inc. v. City of Northlake,* 843 F.Supp. 1231, 1234 (N.D.Ill.1994) (holding that independent contractor claiming removal from city towing rotation list because of political affiliation was not protected by First Amendment); *Inner City Leasing and Trucking Co. v. City of Gary,* 759 F.Supp. 461, 464 (N.D.Ind.1990) (holding that independent contractor claiming termination of contract because of political affiliation not protected by First Amendment); *MEDCARE HMO v. Bradley,* 788 F.Supp. 1460, 1464–66 (N.D.Ill.1992) (holding that independent contractor claiming termination of contract because of lobbying and other political activities not protected by First Amendment); *see also Lundblad v. Celeste,* 874 F.2d 1097, 1102 (6th Cir.), *vacated,* 882 F.2d 207 (6th Cir.1989), *reinstated in pertinent part,* 924 F.2d 627 (6th Cir.1991) (en banc) (holding that it was not clearly established that independent contractor claiming denial of public contract because of political affiliation was protected under First Amendment), *cert. denied,* 501 U.S. 1250, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991). *But see Horn,* 796 F.2d at 680–85 (Gibbons, Sloviter, Mansmannt, Stapleton, JJ., dissenting) (rejecting view that independent contractors can be treated differently than employees for First Amendment purposes).

Our own circuit has suggested, without analysis, that independent contractors do enjoy protection against retaliation for the exercise of First Amendment rights. *Abercrombie,* 896 F.2d at 1233. In *Abercrombie,* the Plaintiff was the owner of a wrecker business who received referrals from the City of Catoosa police chief. The Plaintiff had received all wrecker referrals from the police for a period of time, but after testifying in court as a witness in a suit against the city, he no longer received all wrecker referrals; instead he shared them with another wrecker company. After campaigning on behalf of a mayoral candidate running against the incumbent mayor, the Plaintiff was removed entirely from the police department's wrecker rotation log. He brought a section 1983 action against the city, the police chief, and the mayor, claiming, inter alia, that he had been deprived of a property interest without due process and that Defendants had retaliated against him for the exercise of his First Amendment rights.

After concluding that the Plaintiff had a property interest in wrecker referrals pursuant to applicable state statutes, we also concluded that the district court erred in granting judgment notwithstanding the verdict on his First Amendment retaliation claim. We gave little reasoning, however, simply stating:

> The district court dismissed the entire Section 1983 claim because it found that plaintiff did not have a property right in continued wrecker referrals. But, as noted above, plaintiff *did* have a property right in equal referrals. Furthermore, the Supreme Court has held a property right is not required for a first amendment retaliation claim.

*Id.* at 1233 (citing *Perry,* 408 U.S. 593, 92 S.Ct. 2694). Thus, we simply assumed that an independent contractor could assert a First Amendment retaliation claim.

Other circuits have provided a more detailed analysis of the issue, in reaching the opposite conclusion. The Seventh Circuit in *LaFalce* and the Third Circuit in *Horn* provided the clearest explanation of the reasoning behind those decisions holding that independent contractors enjoy no First Amendment protection when their contracts are terminated or they do not receive government contracts because of their exercise of First Amendment rights.[4] Two broad rationales animated those decisions: (1) the history and legal treatment of patronage practices in government employment; and (2) perceived distinctions between the economic status and

---

**4.** Virtually all of the other cases cited above specifically followed the *Horn* and *LaFalce* decisions.

interests of independent contractors and employees. We examine each in turn.

As the *Horn* majority observed, the practice of political patronage is a "centuries' old" and "historically established and traditionally accepted characteristic[ ] of government, be it on a municipal, county, state, or federal level." *Horn*, 796 F.2d at 672, 673; *see also LaFalce*, 712 F.2d at 294 ("Patronage in one form or another has long been a vital force in American politics."). At the time *Horn* and *LaFalce* were decided, only two Supreme Court cases had addressed the propriety of that long-established practice. In *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), a divided Supreme Court held that a government employer could not discharge a nonpolicymaking, nonconfidential employee solely because of the employee's political beliefs or affiliation. *Id.* at 375, 96 S.Ct. at 2690 (Stewart, J., concurring). A clear majority in *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), reaffirmed that principle, but specifically stated that both *Elrod* and *Branti* dealt only with "the dismissal of public employees for partisan reasons." *Branti*, 445 U.S. at 513 n. 7, 100 S.Ct. at 1292 n. 7. The Court noted that among the many practices falling within the broad definition of a patronage system was "granting supporters lucrative government contracts" but stated that neither *Elrod* nor *Branti* involved such practices.

Thus, as the *Horn* majority stated, "We perceive neither authority nor inkling in these decisions to extend first amendment protection beyond stated circumscriptions." *Horn*, 796 F.2d at 674; *see also LaFalce*, 712 F.2d at 294–95 ("We are particularly reluctant to take so big a step in the face of the Supreme Court's apparent desire to contain the principle of *Elrod* and *Branti*.").

As indicated, the *Horn* and *LaFalce* courts also relied upon presumed practical and economic differences between independent contractors and employees as a basis for finding no violation of contractors' First Amendment rights:

> [M]ost government contractors also have private customers. If the contractor does not get the particular government contract on which he bids, because he is on the outs with the incumbent and the state does not have laws requiring the award of the contract to the low bidder (or the laws are not enforced), it is not the end of the world for him; there are other government entities to bid to, and private ones as well. It is not like losing your job. Of course, the contrast can be overstated; unless the government worker who loses his job cannot find another job anywhere, the loss will not be a total catastrophe.... An independent contractor would tend we imagine to feel a somewhat lesser sense of dependency.

*LaFalce*, 712 F.2d at 294.[5] The Seventh Circuit further observed that "[m]any firms that have extensive government business are political hermaphrodites," and that extending *Elrod* and *Branti* First Amendment protection to independent contractors "would invite every disappointed bidder for a public contract to bring a federal suit against the government purchaser." *Id.; see also Horn*, 796 F.2d at 675.

Thus, of the two broad rationales behind *Horn* and *LaFalce*—that the Supreme Court has restricted patronage practices sparingly and only in connection with employees, and that independent contractors have a different economic status vis-a-vis the government than do employees—the first one arguably supports the decisions permitting the award or termination of public contracts on the basis of political affiliation. The question remains whether it supports the termination of government contracts in retaliation for speech on matters of public concern, particularly in light of the Supreme Court's most recent case involving patronage practices, *Rutan v. Republican Party of Illinois*, 497

---

5. *Horn* involved independent contractors (motor vehicle agents) most of whom in fact were minimally dependent on their contractual arrangements with the government. The court was therefore able to avoid what it called "the emotionally-charged scenario posed at oral argument: Whether the first amendment would protect from politically-motivated discharge an independent contractor with substantial economic dependence on the state, *e.g.*, a one-person shoeshine stand in a public building." *Horn*, 796 F.2d at 675 n. 9.

U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990).

In *Rutan,* the Court extended *Elrod* and *Branti* to hold that "promotions, transfers, and recalls after layoffs based on political affiliation or support" impermissibly infringe the First Amendment rights of public employees. *Rutan,* 497 U.S. at 75, 110 S.Ct. at 2737. The *Rutan* Court's reasoning undermines part of the Seventh and Third Circuits' rationales in their independent contractor cases. The Court dismissed the argument that expanding the protections of *Elrod* and *Branti* would lead to "excessive interference [in state employment] by the Federal Judiciary." *Id.* at 75 n. 8, 110 S.Ct. at 2738 n. 8.

The Court further explained that governmental interests in efficiency and effectiveness can still be preserved by "discharging, demoting, or transferring staff members whose work is deficient" and by permitting the selection or dismissal of "certain high-level employees on the basis of their political views." *Id.* at 74, 110 S.Ct. at 2737. The Court stated the overriding principle as follows: "The First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate." *Id.* at 76, 110 S.Ct. at 2738. It therefore "precludes the government from accomplishing indirectly" that which it cannot command directly. *Id.* at 77–78, 110 S.Ct. at 2738–39 (citing *Perry,* 408 U.S. at 597, 92 S.Ct. at 2697). Arguably, in permitting governments to terminate a public contract because of the contractor's speech, courts have permitted governments to accomplish indirectly that which they cannot accomplish directly—punishment of speech that they do not like. Indeed, it is indisputable that in its role as sovereign, the government cannot punish or otherwise burden the speech of citizens criticizing the government, except in very limited circumstances. Under current Supreme Court jurisprudence, the government, in its role as employer, can only punish or burden speech of its employees criticizing the government when it shows that such speech interferes with the government's ability to function. In permitting just that kind of punishment or burdening of speech by independent contractors, courts accord those who contract with the government a lesser degree of First Amendment protection than ordinary citizens enjoy vis-a-vis their government or than government employees enjoy vis-a-vis their employer.

Nonetheless, the Seventh Circuit has adhered to its *LaFalce* and *Triad Associates* precedents, even after *Rutan.* In *Downtown Auto Parks, Inc. v. City of Milwaukee,* 938 F.2d 705 (7th Cir.), *cert. denied,* 502 U.S. 1005, 112 S.Ct. 640, 116 L.Ed.2d 657 (1991), the court held that a city did not violate the First Amendment when it terminated a lease with an independent contractor who had lobbied against it. The court stated: "We continue to concur in the view taken by the other circuits, and hold that political favoritism in the awarding of public contracts is not actionable." *Id.* at 710. The court held to this view despite acknowledging that, while *Rutan* directly addressed only government *employees,* its "scope . . . and [the] rationale behind it, seem to be at odds with the holding of *LaFalce* and *Triad.*" *Id.* at 709. In our view, *Rutan* has indeed undermined the rationale for *Horn* and *LaFalce* that relied upon the Supreme Court's reluctance to extend *Elrod* and *Branti.*

The other rationale behind *LaFalce* and *Horn* was premised on differences between public employees and independent contractors. Some of these differences are open to question, while others are undeniably true. Whether or not these are relevant distinctions, for example, independent contractors generally have more discretion and control over the performance of their jobs than do employees, and in that respect some may be more like the high-level policymaking employees who are still subject to patronage dismissals under *Rutan, Elrod,* and *Branti. See Vickery v. Jones,* 856 F.Supp. 1313, 1325 (S.D.Ill.1994) ("Thus, like high-level employees, independent contractors do not have supervisors and can be hired or dismissed on the basis of political affiliation to ensure that their work is done in accordance with the party's philosophies."). Still others function in a way very similar to employees. *See Smith v. Cleburne County Hosp.,* 870 F.2d

1375, 1381 (8th Cir.) (applying *Pickering* balancing test to denial of medical staff privileges when "there is an association between the independent contractor doctor and the Hospital that have similarities to that of an employer-employee relationship"), *cert. denied,* 493 U.S. 847, 110 S.Ct. 142, 107 L.Ed.2d 100 (1989).

On the other hand, much of the *LaFalce* and *Horn* rationale for treating independent contractors differently from employees rests on the assumption that independent contractors have less at stake than an employee, and the loss of a contract is less devastating than the loss of a job. While that is undeniably true in some cases, as it was in *Horn,* we have seen no empirical data that it is always or even usually the case. *See Horn,* 796 F.2d at 681 n. 1 (Gibbons, C.J., dissenting) ("There is no empirical evidence that independent contractors, especially those involved in providing personal services, are as a group less dependent on the government for work than are public servants."). And with the increasing "privatization" of government, more and more of the government's work is accomplished through independent contractors, thereby increasing both the number and variety of such contractual arrangements.

We of course recognize that there is a long and vital tradition of treating independent contractors differently from employees in many legal contexts. In this First Amendment context, we reject any categorical distinctions based on whether independent contractors have more or less of an economic interest in their governmental contracts, both because such categorical distinctions are impossible to make and because, in this context, they are irrelevant. There is little justification for a rule that the magnitude of the loss determines whether an individual's First Amendment rights have been violated. As the dissenting opinion in *Horn* pointed out, "The constitutional wrong condemned in *Elrod* and *Branti* was the state's attempt to control the beliefs and associations of its citizens. That control can be just as effective and offensive when the state reduces a citizen's income by twenty percent as when the state reduces the citizen's income by one hundred percent." *Id.* at 683 (Gibbons, C.J., dissenting) (citations omitted). And *Rutan's* extension of protection against patronage practices to a variety of employment practices short of dismissal undermines the argument that only the complete loss of one's job merits First Amendment protection.

In sum, of the two rationales behind decisions such as *LaFalce* and *Horn,* which deny independent contractors the First Amendment protections enjoyed by public employees, the first rationale—the Supreme Court's cautious restriction of patronage practices in government employment—has been undermined by *Rutan* and has limited relevance to whether independent contractors should be protected against retaliation for speech on matters of public concern. The second rationale—presumed differences between the status of independent contractors and employees—is of questionable empirical validity and of dubious relevance to the question of whether First Amendment rights have been violated. Neither one explains why independent contractors should be given less First Amendment protection than either ordinary citizens or government employees. We therefore specifically hold, as we assumed in *Abercrombie,* that an independent contractor is protected under the First Amendment from retaliatory governmental action, just as an employee would be. Thus, the *Pickering* balancing test would apply to such a retaliatory action.[6] We realize that this decision places us squarely in conflict with several other circuits, a posture we do not adopt lightly. We also agree with the Seventh and Third Circuits that this is an area in which Supreme Court guidance is particularly needed.

The district court also held Defendants qualifiedly immune under *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), because their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." We agree that Defendants should be qualifiedly immune from Mr. Umbehr's claim for damages against them in their individual capacities, given the uncertainty in this area of law.

---

6. We recognize that, in Mr. Umbehr's case, damages may be small and difficult to prove.

884

We also affirm the district court's conclusion that there is insufficient evidence proving that Defendant McClure, who was no longer on the county commission when Mr. Umbehr's contract was not renewed, and who in any event had voted earlier not to terminate the contract, caused Mr. Umbehr's injury. We therefore agree that summary judgment was properly granted to him.

 Furthermore, Defendants have raised the issue of absolute legislative immunity, which the district court observed was a "close question." Mr. Umbehr sued Defendants Heiser and Spencer in both their official and individual capacities. In their individual capacities, we have held that they are entitled to qualified immunity. An official capacity suit is just "another way of pleading an action against an entity of which an officer is not an agent." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2036 n. 55, 56 L.Ed.2d 611 (1978). As the Supreme Court has stated, "[t]he only immunities that can be claimed in an official capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment." *Kentucky v. Graham*, 473 U.S. 159, 167, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 114 (1985).

Accordingly, we REVERSE and RE-MAND this case for further proceedings consistent herewith. All pending motions are DENIED.