Larry **BARRETT**, Plaintiff,

v.

Danny Lynn **FIELDS**, individually and as Sheriff of Crawford County, Kansas; **Eugene H. "Sandy" Horton**, individually and as Undersheriff of Crawford County, Kansas; **Eldon Bedene**, individually and in his official capacity with the Crawford County Sheriff's Department, Defendants.

No. 95–2028–KHV.

United States District Court,
D. Kansas.

April 16, 1996.

---

David W. Hauber, Glenn B. Brown, Boddington & Brown, Chtd., Kansas City, KS, for Larry Barrett.

Mary L. Barrier, William E. Hanna, Morrison & Hecker L.L.P., Kansas City, MO, Alan L. Rupe, Morrison & Hecker L.L.P., Wichita, KS, David P. Madden, Michael K. Seck, Fisher, Patterson, Sayler & Smith, Overland Park, KS, James L. Emerson, Office of County Counselor, Girard, KS, for Danny Lynn Fields, Eugene H. Horton, Eldon Bedene and Eugene H. Horton.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

This matter is before the Court on *Defendants' Motion For Judgment As A Matter Of Law* (Doc. # 112) filed December 11, 1995. In their motion, defendants Danny Lynn Fields and Eugene H. "Sandy" Horton, both individually and their official capacities with the Crawford County Sheriff's Department, argue that the evidence is legally insufficient to support the jury verdict for plaintiff, Larry Barrett, under 42 U.S.C. § 1983 and the Sherman Antitrust Act, 15 U.S.C. § 1, *et al.* In their individual capacities, Fields and Horton also contend that as a matter of law they are qualifiedly immune from liability on plaintiff's civil rights claims.

Plaintiff sued defendants Fields, Horton, and Eldon Bedene, individually and in their official capacities with the Crawford County Sheriff's Department,[1] claiming that they had

---

1. At trial, plaintiff claimed that he also sued Eldon Bedene in his official capacity with the City of Arma, Kansas. The Court instructed and the jury found for plaintiff on this claim. The Court did not enter judgment on this claim, however, because it held that plaintiff had failed to provide sufficient notice of intent to sue the City of Arma. *See Memorandum and Order* (Doc. # 120) filed December 20, 1995.

conspired both to unreasonably restrain trade and to obtain or maintain monopoly power in the towing and wrecker industry in Crawford County, Kansas, in violation of Sections 1 and 2, respectively, of the Sherman Antitrust Act. In addition, plaintiff sought damages under 42 U.S.C. § 1983, claiming that defendants had deprived him of property and liberty interests without due process of law in violation of the Fourteenth Amendment, and had retaliated against him for exercising his rights to associate, engage in political activities, and express opinions, in violation of the First Amendment.

The Court held a jury trial from December 4 through December 8, 1995, at which time the jury returned a verdict in favor of plaintiff on all claims. The jury found that defendants individually and in their official capacities had violated Sections 1 and 2 of the Sherman Antitrust Act. The jury also found that defendants had deprived plaintiff of liberty and/or property interests without due process of law, but that Bedene was entitled to qualified immunity in that regard. In that regard, the jury also assessed compensatory damages in the amount of $113,522.00 against Fields and Horton individually and in their official capacities, and against Bedene in his official capacity. The jury assessed punitive damages against Fields and Horton individually, in the amounts of $300,000.00 and $150,000.00 respectively. Finally, the jury found that Fields and Horton had retaliated against plaintiff for exercising First Amendment rights. For this violation, the jury awarded compensatory damages in the amount of $113,522.00 against Fields and Horton individually and in their official capacities, and punitive damages against Fields and Horton individually, in the respective amounts of $300,000.00 and $150,000.00.[2]

 Judgment as a matter of law is appropriate under Rule 50(b) of the Federal Rules of Civil Procedure "only if the evidence, viewed in the light most favorable to the nonmoving party, points but one way and is susceptible to no reasonable inferences supporting the nonmoving party." *Riggs v. Scrivner, Inc.*, 927 F.2d 1146, 1149 (10th Cir.), cert. denied, 502 U.S. 867, 112 S.Ct. 196, 116 L.Ed.2d 156 (1991). Such judgment is proper only when "the evidence so strongly supports an issue that reasonable minds could not differ." *Ryder v. City of Topeka*, 814 F.2d 1412, 1418 (10th Cir.1987). Judgment as a matter of law utilizes the same standard as that used for judgment n.o.v., which should be cautiously and sparingly granted. *See Lucas v. Dover Corp.*, 857 F.2d 1397, 1400 (10th Cir.1988). In determining whether to sustain a motion for judgment n.o.v., the Court must view the evidence and indulge all inferences in favor of the nonmoving party; it cannot weigh the evidence, consider the credibility of witnesses or substitute its judgment for that of the jury. *Lucas*, 857 F.2d at 1400. Nevertheless, the Court must find more than a mere scintilla of evidence favoring the nonmovant; the Court must find that "evidence was before the jury upon which it could properly find against the movant." *Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544, 1547 (10th Cir.1988).

## A. FACTS

The following facts are based on the evidence presented at trial, viewed in the light most favorable to plaintiff.

Fields was elected sheriff of Crawford County from 1984 until he resigned in March, 1995. Horton, who had been undersheriff since 1986, was appointed to succeed Fields. Bedene was a road deputy for the Sheriff's Department. In addition, he served as city councilman, city manager and police commissioner for the City of Arma, Kansas.

In 1985, Fields hired plaintiff as a night jailer for the Sheriff's Department. While working there, plaintiff and Fields disagreed about the hiring of one Bill Cignetti. Plaintiff also disagreed with the department's

---

**2.** Although the jury did not hold Bedene liable for compensatory damages on plaintiff's First Amendment retaliation claim, the jury assessed $50,000.00 punitive damages against him on that claim. Neither the parties nor the Court noted this inconsistency at trial. After trial, plaintiff agreed to relinquish any claim for damages against Bedene on the First Amendment claim, thereby eliminating any need for a new trial. *See Memorandum and Order*, p. 5 (Doc. # 120) filed December 20, 1995.

"cover-up" with regard to missing files of persons arrested for driving under the influence. Plaintiff criticized department operations to Horton. While plaintiff worked for the Sheriff's Department, Joe Michael Cobb, a deputy sheriff, electronically bugged plaintiff's trailer because Fields believed that plaintiff had leaked information about the sheriff's office to the Kansas Bureau of Investigation. Plaintiff reported the illegal bugging to authorities. Because he disapproved of Sheriff Department operations, plaintiff resigned in 1986. In 1988, he displayed a large election sign on his property, supporting the sheriff candidate who was running against Fields.

In 1989, plaintiff began operating Larry Barrett Auto Body, a sole proprietorship engaged in towing and wrecker services and auto body repair. In late 1990 and early 1991, plaintiff wrote three letters to the sheriff, undersheriff, and county commissioners, asking them to place him on the sheriff's dispatch list for towing and wrecker services. He received no response. Fields testified that he did not respond because plaintiff obviously did not like him and because plaintiff had done things at the sheriff's office which led Fields to believe that plaintiff would not properly serve the public if given an opportunity to do so. Fields also stated: "[T]he only reason I don't use Mr. Barrett is that he obviously has no use for the Sheriff's Department. He is an ex-employee of mine and has nothing good to say about us. I don't think he would be in a position to help us out at the accident scene, to hurry and get there and remove vehicles. He has nothing good to say about the deputies and he creates scenes when he gets to places." *Trial Transcript*, Vol. III, pp. 323, 341–42.

Defendants claim that while Fields was sheriff, departmental policy was to provide the safest, most efficient form of wrecker and towing services. When a field deputy came upon an accident or an automobile in need of towing, the deputy was to determine the owner's preference for towing service. If the owner did not have a preference, the deputy was to ask the dispatcher to notify the closest wrecker on the referral list. Defendants contend that Fields had determined the clos-

est, quickest, and most reliable towing services, based upon his experience and knowledge of the individuals who owned the towing companies. Fields never calculated response times for any wrecker service, however, and he did not make any systematic determination (for any period of time) to identify which companies were responsive and accessible to dispatch.

Whenever plaintiff was dispatched to accident scenes, he had a quick response time. When an accident took place two doors east of plaintiff's business, however, the Sheriff's Department called another towing service although plaintiff's service was clearly the closest available. Many times, would-be customers asked a deputy to call plaintiff to tow their cars, but the deputy responded that the dispatcher had been unable to reach plaintiff. In fact, the dispatcher never called plaintiff. In 1992, Bedene told Jerry Golob, a patrolman for the City of Arma, not to call plaintiff for towing services. Bedene told Golob that neither the Sheriff's Department nor the Arma city council wanted him to use plaintiff. At Bedene's instruction, Golob stopped referring tow calls to plaintiff.

Before Fields became sheriff, the Sheriff's Department did not use a system for dispatching tow services. In 1986, Fields implemented a wrecker service procedure which consisted of putting Frontenac's Garage and Brownie's Garage on a call-out list. From 1987 to 1993, the department divided the southeast quadrant of the county into two sectors, with Brownie's handling the south half and Frontenac's handling the north half. In 1993 and 1994, the department restructured the sectors, enlarging the sectors for Brownie's and Frontenac's and adding a sector for Rickman's Garage.

From 1990 through 1994, at least six towing companies operated in Crawford County. During those years, the Sheriff's Department called Frontenac's and Brownie's approximately 85 percent of the time, dividing the remaining 15 percent of the calls among the remaining four tow operators.

For years, the owners of Brownie's and Frontenac's contributed to Fields' political campaigns, performed favors for the Sheriff's Department, and hosted parties and other

gatherings for members of the department. While serving as sheriff, Fields sold his personal Chevy Blazer to Brownie's after he had been unable to sell it on his own. Fields then authorized the Sheriff's Department to buy the car from Brownie's. From January, 1991 to October, 1993, Horton lived in a house which Mr. Stefanoni, the proprietor of Frontenac's, owned. Horton claimed that he paid $150.00 a month for rent, but he could produce no documentation of rent payments and the jury could reasonably infer that none were made.

In 1995, the Sheriff's Department implemented a new rotation system which included all towing services in the county. The new policy required the dispatcher to divide semi-trailer calls between plaintiff and Payne's. In August or September of 1995, however, Horton instructed the dispatcher to call only Payne's, although plaintiff clearly had (and has) the capability to tow semi-trailers. Since 1995, Payne's has refused the most wrecker calls from the Sheriff's Department and plaintiff has refused the least.

## B. FIRST AMENDMENT CLAIM

### 1. *Retaliation for Exercise of First Amendment Rights*

 Defendants contend that plaintiff failed to present sufficient evidence of a causal connection between his protected speech and defendants' refusal to refer non-preference tow calls to plaintiff. In order to establish a causal connection, plaintiff must show that his speech was a substantial or motivating factor in defendants' conduct, but he need not prove that it was the sole reason.

See *Copp v. Unified Sch. Dist. No. 501*, 882 F.2d 1547, 1553 (10th Cir.1989). The jury heard Fields testify that he gave non-preference referrals to the two garages which contributed money to his campaign and "talked highly" of him; that he knew that plaintiff supported his opposition candidate in the 1988 election; and that the reason he did not use plaintiff's services was because plaintiff was critical of the Sheriff's Department. *Trial Transcript*, Vol. III, pp. 310, 234, 341–42. Based on this evidence, along with evidence of other protected activity by plaintiff, the jury could reasonably conclude that plaintiff's speech was a motivating or substantial factor in defendants' refusal to refer non-preference calls to him.[3]

After plaintiff established that his speech was a substantial or motivating factor in defendants' conduct, the burden shifted to defendants to show that they would have engaged in the same conduct irrespective of the protected speech. *Wulf v. City of Wichita*, 883 F.2d 842, 857 (10th Cir.1989). On the evidence presented, the jury could properly reject any argument that defendants would have engaged in the same conduct regardless of plaintiff's speech.[4] Accordingly, judgment as a matter of law on the issue of causation cannot properly be entered.

 Because the Court finds that plaintiff presented sufficient evidence of a causal connection, the Court will review whether plaintiff's speech is constitutionally protected.[5] In *Umbehr v. McClure*, 44 F.3d 876, 883 (10th Cir.), *cert. granted*, —— U.S. ——, 115 S.Ct. 2639, 132 L.Ed.2d 878 (1995), the Tenth Circuit held that the First Amendment protects

3. Defendants do not address plaintiff's claim that they interfered with customer requests for his tow services in retaliation for his exercise of First Amendment rights, and the evidence supports a finding that such interference was in retaliation for plaintiff's exercise of First Amendment rights.

4. At trial, defendants made general claims that they selected certain wreckers based on dependability, equipment, knowledge and promptness. Defendants did not specifically argue that they would have engaged in the same conduct irrespective of plaintiff's speech, and they did not request a jury instruction in this regard. In any event, the jury's finding that defendants willfully retaliated against plaintiff on the basis of his

exercise of First Amendment rights clearly forecloses any conclusion that defendants would have engaged in the same conduct regardless of plaintiff's speech.

5. Allegedly in the interest of brevity, defendants do not argue (except in a footnote) that plaintiff's speech was unprotected by the First Amendment. Defendants nonetheless ask the Court to determine whether plaintiff's speech was protected and thus survives the *Pickering* balancing test, "in the unlikely event the Court finds that plaintiff has satisfied the causal connection requirement." *Memorandum In Support Of Defendants' Motion For Judgment As A Matter Of Law* (Doc. # 113) filed December 11, 1995.

independent contractors, like government employees, from retaliation based on the exercise of political speech. In doing so, it applied the balancing test established in *Pickering v. Board of Education of Township High School District 205,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).[6]

■ In determining whether plaintiff's speech was constitutionally protected under *Pickering,* the Court must first determine whether plaintiff's speech was on a matter of public concern. *Woodward v. City of Worland,* 977 F.2d 1392, 1403 (10th Cir.1992), *cert. denied,* 509 U.S. 923, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993). If so, the Court must balance plaintiff's interests as a citizen, in commenting upon matters of public concern, against the State's interests as an employer or contracting entity, in promoting the efficient referral of tow services. *See id.*

At trial, plaintiff presented evidence that he expressed political opinions in opposition to defendants; supported an opposition candidate for sheriff; disagreed with the Sheriff's Department regarding dismissal of DUI charges; complained to the County Board of Commissioners that the sheriff's method of calling wreckers was unfair; chose not to associate with friends or members of the Sheriff's Department; and reported to authorities the illegal bugging of his home by employees of the Sheriff's Department. Clearly, the content of plaintiff's speech touched on matters of public concern. *See Schalk v. Gallemore,* 906 F.2d 491, 495 (10th Cir.1990) (speech likely to be of public concern where content focuses on public officials' malfeasance or wrongdoing, as opposed to

merely airing grievances of a purely personal nature).

Having concluded that plaintiff's speech touched a matter of public concern, the Court must balance whether plaintiff's interests as a citizen, in commenting on matters of public concern, outweighed those of the Sheriff's Department in promoting efficient tow and wrecker services. *See Considine v. Board of County Comm'rs,* 910 F.2d 695, 700 (10th Cir.1990). Under this balancing test, speech that touches on a matter of public concern will be protected unless defendants can show that some restriction was necessary to prevent the disruption of government services or to ensure the efficient performance of tow services. *See Conaway v. Smith,* 853 F.2d 789, 797 (10th Cir.1988).

Much of plaintiff's speech was in the nature of whistle blowing and the remainder involved political expression which did not interfere with the sheriff's interest in promoting efficient wrecker services. Defendants presented no factual evidence, other than speculation by Fields, that restricting plaintiff from nonpreference tow calls was necessary to promote efficient tow services. Based on the evidence presented at trial, the Court readily concludes that plaintiff's speech survives the balancing test. *See Conaway,* 853 F.2d at 797 (employee's First Amendment interest entitled to greater weight where employee is acting as whistle blower in exposing government corruption). Thus, defendants are not entitled to judgment as a matter of law on plaintiff's First Amendment retaliation claim.[7]

---

**6.** It is not clear to this Court that plaintiff, a tow operator seeking *referrals* from the Sheriff's Department, is an independent contractor of that government agency. In *Abercrombie v. City of Catoosa,* 896 F.2d 1228, 1233 (10th Cir.1990), the Tenth Circuit held that removing a tow operator's name from wrecker referral list because of protected speech violated the tow operator's First Amendment rights. In doing so, the court did not suggest that plaintiff was an independent contractor of the government. If tow operators are independent contractors or are treated as such, they are entitled to less First Amendment protection than that afforded ordinary citizens who do not have a contractual or employment relationship with the government. *See, e.g., Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35; *Blackburn,* 42 F.3d at 931. If tow operators are

treated as ordinary citizens, and not as government employees or independent contractors, they are entitled to more First Amendment protection than that afforded by *Pickering* and *Umbehr.* The Court need not decide whether plaintiff was entitled to the greater First Amendment protection afforded ordinary citizens because it finds that plaintiff's speech was protected even under the less protective standard articulated in *Pickering* and *Umbehr.*

**7.** Defendants maintained throughout trial that they referred tow services based on ability, efficiency and quality of service to the public. Defendants deny that they rewarded friends and political supporters with tow business and punished plaintiff for not being within their favored

### 2. Qualified Immunity

■ Defendants individually assert that they are entitled to qualified immunity on plaintiff's First Amendment retaliation claim. Specifically, defendants assert that at the time of their conduct, Tenth Circuit law had not clearly prohibited a governmental entity from refusing to refer tow service calls based on the operator's exercise of First Amendment rights.

■ Under the defense of qualified immunity, government officials performing discretionary functions will not be held liable for their conduct unless their actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Once defendants raise the defense of qualified immunity, "plaintiff initially bears a heavy two-part burden." *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir.1995). First, plaintiff must demonstrate that defendants' actions violated a constitutional or statutory right. *Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir.1995). Second, plaintiff must show that the constitutional or statutory right was clearly established at the time of defendants' conduct. *Davis v. Scherer*, 468 U.S. 183, 197, 104 S.Ct. 3012, 3020–21, 82 L.Ed.2d 139 (1984). Plaintiff must articulate with specificity both defendants' conduct and the clearly established constitutional right. *Fay*, 45 F.3d at 1475.

■ In determining whether the relevant law was clearly established, the Court examines the law as it existed at the time of defendants' actions. *Romero v. Board of County Comm'rs*, 60 F.3d 702, 704 (10th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 776, 133 L.Ed.2d 728 (1996). Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as plaintiff maintains. *Medina v. City and County of Denver*, 960 F.2d 1493 (10th Cir.

1992) (citing *Stewart v. Donges*, 915 F.2d 572, 582–83 & n. 14 (10th Cir.1990)). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Although the specific action in question does not have to have been previously held unlawful, "in light of pre-existing law the unlawfulness must be apparent." *Id.* Thus, "precise factual correlation between the then-existing law and the case at-hand is not required." *Snell v. Tunnell*, 920 F.2d 673, 699 (10th Cir.1990), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991). The Tenth Circuit considers law to be clearly established when it is developed well enough to inform the reasonable official that his or her conduct violates that law. *Patrick v. Miller*, 953 F.2d 1240, 1249 (10th Cir.1992).

Allegations of constitutional violations which require courts to balance competing interests may make it more difficult to find that the law was clearly established. *Medina*, 960 F.2d at 1498; *see also Melton v. City of Oklahoma City*, 879 F.2d 706, 729 (10th Cir.1989) (where *Pickering* balancing is required law less likely to be well established). The fact that competing interests must be balanced injects a factor for the Court to consider in determining whether the conduct was clearly unconstitutional. *Medina*, 960 F.2d at 1497. Nevertheless, conduct may be so egregious that a reasonable person would know it is unconstitutional even though it is judged by a balancing test. *Medina*, 960 F.2d at 1497. The Tenth Circuit has recognized that application of the defense of qualified immunity to First Amendment cases is "difficult, but not impossible." *Patrick*, 953 F.2d at 1246. In these circumstances, the Tenth Circuit instructs us to apply a case-by-case analysis with careful consideration of the underlying principles of the qualified immunity defense. *See Melton* 879 F.2d at 729.

According to defendants, the *Umbehr* decision conclusively demonstrates that at the

---

group. Defendants also argue that even if they had done so, their conduct did not violate plaintiff's right to associate under the First Amendment. The Court need not reach this argument,

however, because the jury's verdict on plaintiff's First Amendment claim is overwhelmingly supported on the basis of other protected activity.

time they allegedly retaliated against plaintiff based on his exercise of First Amendment rights, Tenth Circuit law did not clearly establish the illegality of their conduct. The Court disagrees. In *Umbehr*, the Tenth Circuit ruled that an independent contractor who had a trash hauling contract with the county was protected from retaliatory government action under the First Amendment. The Tenth Circuit noted that other circuits had split on the issue but that it previously, in *Abercrombie v. City of Catoosa, Okla.*, 896 F.2d 1228, 1233 (10th Cir.1990), had suggested without analysis that independent contractors do enjoy protection from First Amendment retaliation. *Umbehr*, 44 F.3d at 879–880. The *Umbehr* court specifically held, stating that it had assumed as much in *Abercrombie*, "that an independent contractor is protected under the First Amendment from retaliatory governmental action, just as an employee would be." *Umbehr*, 44 F.3d at 883. The court went on to find that the individual defendants in *Umbehr* were entitled to qualified immunity because the law in this area was uncertain at the time they allegedly violated plaintiff's First Amendment rights.

In *Abercrombie*, the operator of a wrecker service sued the police department for removing his name from a wrecker rotation log after he had campaigned on behalf of a mayoral candidate. Initially, plaintiff had received all wrecker referrals from the police. After he testified as a witness in a lawsuit against the city, the police rotated wrecker referrals between plaintiff and another wrecker. Finally, after plaintiff campaigned on behalf of the opposition mayoral candidate, the police removed his name from the wrecker rotation log and stopped referring calls to him. The jury found for plaintiff on his First Amendment retaliation claim. The district court entered judgment notwithstanding the verdict because it found that plaintiff did not have a property right in continued wrecker referrals. The Tenth Circuit reversed, holding that regardless whether plaintiff held a property interest in receiving such referrals, plaintiff had a separate claim for First Amendment retaliation. In so finding, the court quoted the following language from *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972):

> even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.

*Abercrombie*, 896 F.2d at 1228 (quoting *Perry* 408 U.S. at 597, 92 S.Ct. at 2697). The *Abercrombie* court did not indicate whether it considered plaintiff an independent contractor of the government.

Our plaintiff, like plaintiff in *Abercrombie*, occupies a relationship with the government that is neither that of an ordinary citizen nor that of an independent contractor in the typical sense. Plaintiff does not have a contract with the government, yet the government may have a legitimate interest in regulating plaintiff's speech to the extent that it interferes with the government's role in ensuring safe and efficient tow services for the public. The *Umbehr* court referred to the *Abercrombie* plaintiff as an independent contractor, although that conclusion is not clearly established in the *Abercrombie* opinion. Nevertheless, *Abercrombie* clearly established that tow operators (whether we classify them as independent contractors or otherwise) are entitled to protection against retaliation based on the exercise of First Amendment rights. After *Abercrombie*, defendants should reasonably have known that their conduct violated clearly established Tenth Circuit law. *See, e.g., Patrick*, 953 F.2d at 1248; *Melton*, 879 F.2d at 729–730. Accordingly, they cannot claim the benefits of qualified immunity.

C. DEPRIVATION OF PROPERTY AND/OR LIBERTY

■ Plaintiff claims that defendants deprived him of property and/or liberty interests, without due process of law, by removing him from the nonpreference rotation list for semi-trailer referrals in Crawford County;

interfering with customer requests for towing services in Crawford County; ·and interfering with business referrals from the City of Arma.

 Property interests are created and their dimensions defined by existing rules or mutual understandings that stem from an independent source, such as state or local law or express or implied contracts, and that secure certain benefits and support claims of entitlement to those benefits. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709; *Perry,* 408 U.S. at 601, 92 S.Ct. at 2699–2700; *Anglemyer v. Hamilton County Hosp.,* 58 F.3d 533, 536 (10th Cir.1995). In order to have a property interest protected by procedural due process under the Fourteenth Amendment, a person must have a legitimate claim of entitlement to the benefit, as opposed to an abstract need or desire for the benefit or a unilateral expectation of receiving it.[8] *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). A claim of entitlement need not be based on specific statutory or contractual provisions; such claim is protected if rules or mutually explicit understandings support a claim of entitlement that the recipient can invoke at a hearing. *Casias v. City of Raton,* 738 F.2d 392, 394 (10th Cir.1984).

Plaintiff claims that the 1995 rotation policy created for him a property interest in receiving nonpreference semi-trailer referrals.[9] Specifically, plaintiff asserts that he had a legitimate expectation under the new policy, based on mutually explicit understandings, that the Sheriff's Department would not arbitrarily remove his name from the rotation list. At trial, however, plaintiff presented no evidence of explicit or implicit rules or understandings between him and the Sheriff's Department concerning continued referrals. At most, plaintiff demonstrated that the Sheriff's Department placed him on the rotation list and arbitrarily removed him, without notice, several months later.

Placing plaintiff on a list, without more, does not create a constitutionally protected property interest. *See, e.g., White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1062 (2nd Cir.) (informal towing assignment system with no specificity as to duration of relationship did not create property interest where system not authorized by statute or regulation, not contractual in nature, and not awarded based on bids), *cert. denied,·* 510 U.S. 865, 114 S.Ct. 185, 126 L.Ed.2d 144 (1983); *Piecknick v. Commonwealth of Pennsylvania,* 36 F.3d 1250 (3rd Cir.1994) (discontinuing custom of awarding exclusive towing assignments, pursuant to guidelines, did not deprive tow operator of property or liberty interest where no allegation that custom was to continue for any certain term). Thus the Court agrees that plaintiff has failed to show a legitimate property interest in remaining on the rotation list for nonpreference semi-trailer referrals.

 Plaintiff also claims that defendants deprived him of liberty and/or property interests by interfering with customer requests for his services in Crawford County and business referrals from the City of Arma. "[T]he right to hold specific private employment and to follow a chosen profession free from unreasonable government interference comes within the 'liberty' and 'property' concepts of the Fifth [and Fourteenth] Amendment[s]." *Greene v. McElroy,* 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959). Nevertheless, in order to rise to the level of a constitutional depriva-

---

8. When a property or liberty interest is protected by procedural due process under the Fourteenth Amendment, a person is entitled to notice and an opportunity for some kind of hearing before he or she is deprived of that interest, except for extraordinary situations wherein some valid governmental interest justifies postponing the hearing until after the event. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 570 n. 7, 92 S.Ct. 2701, 2705 n. 7, 33 L.Ed.2d 548 (1972) (citations omitted).

9. The new policy divided the county into three sectors and required the dispatcher to rotate calls among several tow operators within each sector. Plaintiff's name was included on the rotation list for one of the sectors. *Trial Transcript,* Vol. III, p. 160. In addition, the policy required the dispatcher to rotate nonpreference semi-trailer calls between plaintiff and Payne's. *Id.* at p. 168. In approximately August or September of 1995, Sheriff Horton instructed dispatchers to call only Payne's for nonpreference semi-trailer tow jobs. *Id.* at pp. 165, 168–69.

tion, plaintiff must demonstrate that defendants significantly altered or denied him the opportunity to pursue his livelihood or the property interest in the profits derived therefrom. *See, e.g., Paul v. Davis,* 424 U.S. 693, 711–712, 96 S.Ct. 1155, 1165–66, 47 L.Ed.2d 405 (1976); *San Jacinto Sav. & Loan v. Kacal,* 928 F.2d 697, 703 (5th Cir.1991) (police's concerted action which caused plaintiff to close business distinguishable from government interference which merely caused plaintiff to lose some of his clients); *Goulding v. Feinglass,* 811 F.2d 1099, 1102 (7th Cir.), *cert. denied,* 482 U.S. 929, 107 S.Ct. 3215, 96 L.Ed.2d 701 (1987); *Phillips v. Vandygriff,* 711 F.2d 1217, 1222–23 (5th Cir.1983) (plaintiff's claim that defendant's de facto licensing system excluded him from chosen profession stated claim for deprivation of liberty), *cert. denied,* 469 U.S. 821, 105 S.Ct. 94, 83 L.Ed.2d 40 (1984).

At trial, plaintiff presented evidence that several potential customers requested deputies to call plaintiff to tow their cars, and that the deputies replied that plaintiff was not available without checking. In addition, according to plaintiff's evidence, Bedene instructed Golob that the sheriff and the city council wanted him to stop referring tow jobs to plaintiff. *Trial Transcript,* Vol. III, pp. 226–28. At most, plaintiff established that defendants interfered with some customer requests in Crawford County and business referrals from the City of Arma. Plaintiff did not demonstrate that such interference significantly altered or deprived him of the right to pursue his occupation. Thus, plaintiff did not establish a constitutional deprivation of liberty. *See Piecknick,* 36 F.3d at 1262 (Fourteenth Amendment protects liberty to pursue a particular calling or occupation, not right to a specific job).

Likewise, plaintiff has not demonstrated that he had a constitutionally protected property interest in the potential business from customer requests and business referrals. Section 1983 does not provide a right to be free of injury whenever a government actor may be characterized as a tortfeasor. *Kacal,* 928 F.2d at 700 (citing *Paul,* 424 U.S. at 701, 96 S.Ct. at 1160–61). While Kansas tort law protects against injury resulting from interference with business, plaintiff has not demonstrated that Kansas law provides him any legal guarantee or legitimate claim of entitlement to receive potential business calls or referrals. Thus, plaintiff has failed to establish that defendants' interference with customer requests and business referrals denied him a constitutionally protected property or liberty right. *See, e.g., Davis,* 424 U.S. at 711–12, 96 S.Ct. at 1165–66 (Kentucky law not extend legal guarantee of present enjoyment of reputation although it protects against injury to reputation by virtue of its tort law).

## D. ANTITRUST CLAIMS

▪ Plaintiff claims that defendants, individually and in their official capacities with Crawford County, conspired with Brownie's and/or Frontenac's to restrain and monopolize trade in violation of Sections 1 and 2, respectively, of the Sherman Antitrust Act. Defendants argue that plaintiff failed to prove that they possessed and exercised market power or restrained or injured competition for tow services in the relevant market.[10]

▪ Under Section 1 of the Sherman Act, any combination or conspiracy which imposes an unreasonable restraint on trade is unlawful. *See* 15 U.S.C. § 1; *SCFC ILC,*

---

**10.** Although defendants contend that they are entitled to judgment as a matter of law on all of plaintiff's antitrust claims, their arguments do not address plaintiff's claim for conspiracy to monopolize under Section 2 of the Sherman Act. To establish such a claim, plaintiff must show: (1) the existence of a combination or conspiracy to monopolize; (2) overt acts done in furtherance of the combination or conspiracy; (3) an effect upon an appreciable amount of interstate commerce; and (4) a specific intent to monopolize. *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Professional Publications,*

*Inc.,* 63 F.3d 1540, 1556 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 702, 133 L.Ed.2d 659 (1996). Proof of market power in a relevant market is unnecessary for such claim. *See Monument Builders of Greater Kansas City, Inc. v. American Cemetery Ass'n of Kansas,* 891 F.2d 1473, 1484 (10th Cir.1989), *cert. denied,* 495 U.S. 930, 110 S.Ct. 2168, 109 L.Ed.2d 498 (1990). Because defendants do not challenge the elements of plaintiff's conspiracy to monopolize claim, the Court assumes that defendants' motion goes only to plaintiffs claim under Section 1 of the Sherman Act.

*Inc. v. Visa U.S.A., Inc.,* 36 F.3d. 958, 963 (10th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 2600, 132 L.Ed.2d 846 (1995). Under the rule of reason test, a restraint is unreasonable if its anticompetitive consequences substantially outweigh its legitimate business justifications. *Visa,* 36 F.3d. at 963. Before reaching this balancing test, plaintiff must demonstrate that defendants possessed market power. *See Visa,* 36 F.3d at 965. Plaintiff may demonstrate market power with evidence of either power to control prices or power to exclude competition. *Reazin v. Blue Cross and Blue Shield of Kansas, Inc.,* 899 F.2d 951, 966–67 (10th Cir.), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990); *Westman Comm'n Co. v. Hobart Int'l, Inc.,* 796 F.2d 1216, 1225–26 n. 3 (10th Cir.1986), *cert. denied,* 486 U.S. 1005, 108 S.Ct. 1728, 100 L.Ed.2d 192 (1988). ,

Defendants contend that plaintiff failed to present sufficient evidence of market power in the relevant market. The jury heard evidence that a good portion of tow calls occur in the southeast portion of Crawford County. *Trial Transcript,* Vol. III, pp. 153. Pittsburg, by far the largest city in the county, is located in the southeast portion of the county and has dispatch facilities independent from the Sheriff's Department.[11] *Trial Transcript,* Vol. III, pp. 156–57. The sheriff's dispatcher refers tow calls for sheriff deputies in the southeast portion, as well as throughout the remainder of county. *Trial Transcript,* Vol. III, pp. 154. In addition to referring tow services for sheriff deputies, the sheriff's dispatcher calls tow services for many of the municipal police departments in Crawford County, including Arma, Mulberry, Walnut, Cherokee, McCune, and Arcadia. *Trial Transcript,* Vol. III, pp. 154–56. Based on their relative jurisdictional sizes, the jury could reasonably conclude that the Sheriff's Department and the police department of Pittsburg dispatch the vast majority of wreckers in Crawford County. Pittsburg included plaintiff on its wrecker rotation list, along with five other wreckers. *Trial Transcript,* Vol. II, p. 27. Between 1990 and 1994, plaintiff received an average of 86 calls

per year from Pittsburg. *See* Plaintiff's Trial Exhibit 17. Assuming that plaintiff received one sixth of the dispatch calls from Pittsburg, the jury could reasonably conclude that Pittsburg dispatched approximately 516 wreckers per year. The Sheriff's Department, on the other hand, dispatched an average of 588 wreckers per year during that same time period. *See Trial Transcript,* Vol. II, pp. 50–54. Based on this evidence, the jury could reasonably conclude that defendants controlled roughly 50 percent of dispatch calls in Crawford County and had the power to control prices or exclude competition in the relevant market.

Defendants also argue that plaintiff failed to present sufficient evidence of injury to competition in the relevant market. Tammy Adams, chief dispatcher for the Sheriff's Department, testified that from 1986 through 1994, Horton directed dispatchers to split the towing business in the southeast quadrant (the most populous portion of Crawford County) into sectors assigned to Brownie's and Frontenac's, although there is no justification for dividing the business into these sectors. *Trial Transcript,* Vol. III. pp. 151–53, 161, 171. Adams agreed that tow operators not on the swap-list, such as plaintiff, had less likelihood of getting future auto body and tow business, and that nonpreference referrals from the Sheriff's Department generated future business for Brownie's and Frontenac's. *Id.* at p. 166–67. In addition, plaintiff demonstrated that between 1990 and 1994, on average, the Sheriff's Department dispatched 85 percent of all wrecker referrals to Brownie's or Frontenac's and divided the remaining 15 percent between four other tow operators. Based on this evidence, the jury could easily determine that defendants restrained competition for tow services in Crawford County and that the restraint substantially injured competition in market with little or no legitimate business justification.

Based on the foregoing analysis, the Court concludes that defendants are not entitled to judgment as a matter of law on plaintiff's antitrust claims.

---

**11.** Frontenac and Gerard also have independent dispatch facilities. Although the next two largest cities in the county, they are substantially smaller in size than Pittsburg.

**IT IS THEREFORE ORDERED** that *Defendants' Motion For Judgment As A Matter Of Law* (Doc. # 112) filed December 11, 1995, should be and hereby is sustained as to plaintiff's claims for deprivation of liberty and/or property and overruled as to plaintiff's claims for First Amendment retaliation and antitrust violations.